UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **Aaron A. Benner,** | **Civil No. 17-01568 (SRN/KMM)** |
| **Plaintiff,** | |
| v. | **MEMORANDUM OPINION & ORDER** |
| **Saint Paul Public Schools, I.S.D. #625,** | |
| **Defendant.** | |

Reid M. Goldetsky, 2000 S. Plymouth Rd., Ste. 222, Minnetonka, MN 55305, for Plaintiff.

Sarah E. Bushnell & Jeffrey M. Markowitz, Arthur, Chapman, Kettering, Smetak & Pikala, PA, 81 S. 9th St., Ste. 500, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant Saint Paul Public Schools' ("SPPS") Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) [Doc. No. 5]. For the reasons set forth herein, and as stated at the motion hearing, SPPS's Motion is denied in part and granted in part.

I.   **BACKGROUND**

On a motion to dismiss under Rule 12(b)(6), the Court accepts as true the factual allegations in the complaint and construes all reasonable inferences arising therefrom most favorably to the plaintiff. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013) (citing *Gross v. Weber*, 186 F.3d 1089, 1090 (8th Cir. 1999)).  Plaintiff Aaron Benner is a licensed teacher and an African American male. (Am. Compl. ("Compl.") [Doc. No. 12]

¶ 6.) In 1995, he began working for SPPS, and he obtained tenure there in 1999. (*Id.* ¶ 4.) That year, however, he took a leave of absence from SPPS and went to work for a charter school, Community of Peace, where he remained until 2007, when he was rehired by SPPS. (*Id.*) Plaintiff's final year working for SPPS was the 2014–2015 academic year, (*id.*), when he taught fourth grade at SPPS's Johnson Elementary School ("Johnson") in St. Paul. (*Id.* ¶ 7.) At the end of that year, Plaintiff alleges that he was constructively discharged. (*Id.* ¶ 37–38.)

Central to this case is SPPS's "racial equity" policy, which Plaintiff opposes. According to Plaintiff—who was the only African American teacher at Johnson while he worked there, (*id.* ¶ 7)—pursuant to this policy, "African American students are not disciplined as severely as the Caucasian students." (*Id.* ¶ 11.) This is because SPPS "wants to ensure [African American students] get as much classroom time as possible," (*id.*), and is "trying to keep [its] discipline numbers down to address [] racial disparities." (*Id.* ¶ 12.) Plaintiff opposes the racial equity policy on two primary grounds. First, "he believes that how the policy was implemented was not helping the students and is racially discriminatory[,] particularly [to] the African American male students." (*Id.* ¶ 10.) Plaintiff also opposes it because of its impact on his job, stating that "[b]ecause Plaintiff did not support [SPPS]'s racial equity policy, he could not fulfill his employment duties, specifically, implement[ing] the goals and objectives of the District and the school and/or program to which [he was] assigned." (*Id.* ¶ 14.)

At a school board meeting on May 20, 2014, Plaintiff voiced his opposition to this racial equity policy. (*Id.* ¶¶ 11–12.) There, Plaintiff stated that "Dr. King would be very

2

disappointed because here we are 51 years later and the concept of the matter at hand is skin color." (*Id.* ¶ 12.) Plaintiff complained that with this policy, "if troubled students were African American[,] they were not being held accountable for their behavior issues." (*Id.*) Plaintiff also stated that "the school is setting the African American students up to fail" and expressed concern about the amount of violence at the school. (*Id.*) Plaintiff believes that his opposition put SPPS on notice that the racial equity policy was racially discriminatory. (*Id.*)

According to Plaintiff, his opposition to the racial equity policy triggered a series of negative consequences, including investigations—some frivolous—into his conduct. He points to a clean record prior to September 2014, (*id.* ¶ 7), when, after voicing his opposition, he began getting investigated. (*Id.* ¶ 13.) The first of these investigations arose out of an incident involving student violence. (*Id.* ¶¶ 17–19.) On September 22, 2014, Plaintiff witnessed a male fourth-grader punch a female fourth-grader, knocking her out. (*Id.* ¶ 17.) Plaintiff notified Lisa Gruenewald, Johnson's principal, (*id.* ¶ 15), of the incident. (*Id.* ¶ 17.) A few days later, Plaintiff called the mothers of both students involved in the incident and found out that neither of them had been contacted by the school. (*Id.* ¶ 17–18.) The female student's mother "was beyond angry" to find out that she hadn't been notified directly by the school after her daughter had been physically assaulted. (*Id.* ¶ 17.) The female student's mother then contacted the school and was upset with Gruenewald for how the situation was handled. (*Id.* ¶ 19.)

After the incident, SPPS commenced an investigation and disciplined Plaintiff for making contact with the student's mother. (*Id.*) On October 20, 2014, a disciplinary action was recorded in Plaintiff's file for purportedly "violating [SPPS's] data privacy policy."

(*Id.*) This policy states that teachers should "not discuss students or other staff members in public places," and that "data should be shared on a 'need to know' basis." (*Id.* ¶ 9.) Plaintiff, however, disputes any wrongdoing, and maintains that he did not violate SPPS's data privacy policy, but was merely "carrying out one of his duties of employment, namely, 'maintaining contacts or communications with parents of students.'" (*Id.*) Plaintiff claims that SPPS's investigation and disciplinary action were retaliatory. (*Id.*)

The second investigation into Plaintiff's behavior arose out of another instance of student violence. (*Id.* ¶ 20.) On October 24, 2014, a student broke a fellow student's eyeglasses, and, after being questioned by Plaintiff about the incident, bullied a separate student who had given Plaintiff details of the incident. (*Id.*) Plaintiff alleges that he was investigated, and—without the opportunity to speak with or meet with Grunewald—was "disciplined for inappropriately handling this bullying situation." (*Id.*) This disciplinary action was again recorded in Plaintiff's file, and he was issued a disciplinary memorandum on December 2, 2014. (*Id.*)

Plaintiff alleges that with respect to this second investigation, he was treated differently than similarly situated Caucasian teachers. (*Id.* ¶ 21–22.) For instance, he points to an incident in May of 2015, when a Caucasian teacher—who had the same supervisor and same employment duties as Plaintiff, (*id.* ¶ 22)—"berated and shamed" a student in front of class after the student had engaged in behavioral misconduct. (*Id.* ¶ 21.) However, even though this Caucasian teacher's behavior was reported to Gruenewald, SPPS did not investigate. (*Id.* ¶ 21–22.) Instead, Gruenewald met with the Caucasian teacher the next

day—an opportunity denied to Plaintiff—and told her to "just be careful" with what she said to students. (*Id.* ¶ 21.)

Shortly after the second disciplinary memo was placed in his file, a series of events led Plaintiff to believe that SPPS generally was treating him differently than similarly situated Caucasian teachers. For instance, on December 9, 2014, after Plaintiff had reported a student who threatened a teaching assistant ("TA"), Plaintiff emailed Gruenewald and an assistant administrative intern to follow up on several matters, including his report of threats against the TA. (*Id.* ¶¶ 24–25.) A few days later, on December 17, 2014, Human Resources approached Plaintiff to discuss an offer to transfer him to another elementary school immediately after winter break. (*Id.* at ¶ 26.) At first, Plaintiff was told that the offer would remain open for 48 hours, but, later that day, he was told that the offer would only remain open for 24 hours. (*Id.*) Plaintiff declined the offer, and believes SPPS was "trying to silence him," in particular because no other similarly situated employees were given only 24 hours to decide whether or not to transfer. (*Id.*) Moreover, Plaintiff alleges that, in contrast to other teachers, he routinely had students with disciplinary problems placed in his classroom from other grades without an explanation. (*Id.* ¶ 29.)

The last two formal investigations into Plaintiff's conduct occurred in January and February of 2015. On January 13, 2015, Plaintiff called in sick to work, and SPPS initiated an investigation to determine if Plaintiff had in fact been sick. (*Id.* ¶ 31.) As part of this investigation, Plaintiff provided a doctor's note, but was "shocked that calling in sick would trigger a District investigation." (*Id.*) As with his second investigation, Plaintiff claims that he was treated differently than Caucasian teachers, as "[n]o other teachers were subjected to

a District investigation for calling in sick from Johnson Elementary." (*Id.*) Finally, the fourth investigation occurred in February of 2015 after Plaintiff left the class unattended while he delivered a behavior referral to the behavior specialist. (*Id.* ¶ 32.) Plaintiff does not dispute this violation. (*Id.*)

In the months that followed, Plaintiff continued to endure hostility from the school authorities and alleges that he was treated very differently than his fellow Caucasian teachers. For instance, on April 28 and 29 of 2015, a student assaulted Plaintiff. (*Id.* ¶ 34.) A few days later, on May 1, 2015, several of Plaintiff's students were asked, outside of Plaintiff's presence, whether Plaintiff had provoked the assaults by hitting students first. (*Id.* ¶ 35.) When Plaintiff learned of this, he e-mailed Gruenewald, stating that he needed to be included in the investigations. (*Id.*) Plaintiff did not receive a response to the e-mail, but, a few days later, Gruenewald informed Plaintiff that the student who assaulted him had been transferred to another fourth grade classroom. (*Id.*) Plaintiff alleges that he was "retaliated against" and "treated differently than other similarly situated employees because he was not allowed to give his side of the story during the investigation," and that "no other employees were subjected to this type of treatment when an assault occurred between students and staff." (*Id.*)

After all these incidents, in May of 2015, Plaintiff began to fear that he could be terminated at any time. (*Id.* ¶ 37.) Plaintiff believed that he could be fired because the disciplinary actions recorded in his file were, in fact, "'fireable' offenses." (*Id.*) Moreover, Plaintiff was apprehensive about his position, and whether he would be subject to further disciplinary action, as he "never knew if he would be investigated or disciplined for doing

6

his job." (*Id.*) Plaintiff also believed that the investigations and disciplinary actions were harassment and retaliation by SPPS "in an effort to force him to quit or resign." (*Id.*)

Seeking to avoid the serious consequences of termination—*i.e.*, negative effects on on his future employment, his tenure status, and his retirement benefits, (*id.*)—Plaintiff began to look for other employment. (*Id.* ¶ 38.) On May 14, 2015, he was hired by the charter school where he previously worked, Community of Peace. (*Id.*) At the end of the school year nearly three months later, Plaintiff tendered his resignation to SPPS on August 4, 2015, effective that same day. (*Id.*)

On August 12, 2015, Plaintiff filed a charge of discrimination and harassment with the EEOC. (*Id.* ¶ 39.) Plaintiff alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the St. Paul Human Rights Ordinance, Chapter 183.03 and 183.10. (*Id.*) The EEOC sent the case to the St. Paul Department of Human Rights and Equal Economic Opportunity, Human Rights Division ("SPDHR") for an investigation and determination. (*Id.*) On March 31, 2017, the SPDHR determined that there was probable cause to believe that SPPS had engaged in unlawful race discrimination and retaliation against Plaintiff. (*Id.*)

On May 11, 2017, Plaintiff initiated this action against SPPS, asserting three counts under Title VII: 1) race discrimination (Count I); 2) retaliation (Count II); and 3) a hostile and abusive working environment (Count III). (First Compl. [Doc. No. 1].) On July 10, 2017, SPPS filed a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. (Mot. Dismiss [Doc. No. 5].) However, on July 31, 2017, Plaintiff filed an Amended Complaint, which is now the operative complaint, adding a

7

fourth count for constructive discharge. (*See* Compl. ¶ 45–46.) Plaintiff also filed a Reply to SPPS's Motion to Dismiss, urging the Court, in part, to treat SPPS's Motion to Dismiss as a motion to dismiss the Amended Complaint. (Pl.'s Opp'n [Doc. No. 11].) A hearing was held on October 4, 2017, and all parties agreed that SPPS's motion should be construed as a motion to dismiss the Amended Complaint.

## II.   DISCUSSION

### A.  Standard of Review

When evaluating a motion to dismiss under Rule 12(b)(6), the Court assumes the facts in the complaint to be true and construes all reasonable inferences from those facts in light most favorable to the plaintiff. *Hager*, 735 F.3d at 1013. The Court, however, need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions that plaintiffs draw from the facts pled. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). In addition, the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss. *See* Fed. R. Civ. P. 12(d). The Court may, however, consider exhibits attached to the complaint and documents that are necessarily embraced by the pleadings.[1] *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n. 4 (8th Cir. 2003).

### B.  Legal Framework

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to

---

[1] Plaintiff included the probable cause determination issued by SPDHR in his Amended Complaint. (*See* Compl. at 14–25.)

relief." In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the United States Supreme Court clarified that this Rule does not require that a complaint contain "detailed factual allegations," but that it does require that it contain facts with enough specificity "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556.)

In *Swierkiewicz v. Sorema N.A.*, the Supreme Court considered the pleading requirements applicable to employment discrimination suits. 534 U.S. 506 (2002). In particular, it examined whether the complaint must contain specific facts establishing a prima facie case of discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Swierkiewicz*, 534 U.S. at 508. The Court held that it did not, "emphasiz[ing] that the prima facie model is an evidentiary, not a pleading, standard." *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016) (quoting *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1st Cir. 2013)). Because discovery may ultimately produce direct evidence of discrimination—rendering the *McDonnell Douglas* framework unnecessary—it would be "incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to

9

succeed on the merits if direct evidence of discrimination is discovered."[2] *Swierkiewicz*, 534 U.S. at 506.

Nevertheless, the "elements of the prima facie case are [not] irrelevant to a plausibility determination in a discrimination suit." *Blomker*, 831 F.3d at 1056 (alteration in original) (quoting *Rodriguez-Reyes*, 711 F.3d at 54). "Instead, such 'elements are part of the background against which a plausibility determination should be made.'" *Id.* (quoting *Rodriguez-Reyes*, 711 F.3d at 54.) In other words, "the elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim." *Id.* (quoting *Rodriguez-Reyes*, 711 F.3d at 54.)

Keeping these principles in mind, this Court now turns to whether Plaintiff's complaint meets these requirements.

### C. Plaintiff's Claims

Plaintiff raises three claims under Title VII: 1) race discrimination; 2) retaliation; and 3) a hostile and abusive working environment.[3] Each claim is addressed in turn.

---

[2] Although *Swierkiewicz* was decided before *Twombly* and *Iqbal*, those two cases did nothing to disturb *Swierkiewicz*'s holding that the *McDonnell Douglas* framework does not apply at the pleading stage of employment discrimination cases. *See Twombly*, 550 U.S. at 569–70; *see also Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (2014) (per curiam) (citing *Swierkiewicz* approvingly); *Reed v. AirTran Airways*, 531 F.Supp.2d 660, 666 (D. Md. 2008) ("The *Twombly* Court made clear that its holding did not contradict the *Swierkiewicz* rule that 'a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination.'" (alteration in original) (citations omitted)).

[3] Plaintiff's Amended Complaint added "constructive discharge" as the fourth count. (*See* Compl. ¶¶ 45–46.) However, as discussed *infra*, "constructive discharge is but one incident by which an employee can demonstrate an adverse [employment] action." *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 928 (8th Cir. 2004). Thus, this Court

### 1. Race Discrimination

Title VII makes it unlawful for certain employers "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006). To establish a prima facie case of race discrimination under the *McDonnell Douglas* framework—a burden that "is not onerous," *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)—a plaintiff must show that: "(1) he was a member of a protected group; (2) he was qualified to perform the job; (3) he suffered an adverse employment action; and (4) circumstances permit an inference of discrimination." *Banks v. Deere*, 829 F.3d 661, 666 (8th Cir. 2016) (quoting *Xuan Huynh v. U.S. Dep't of Transp.*, 794 F.3d 952, 958 (8th Cir. 2015)).

Using these elements as a "prism to shed light upon the plausibility of the claim," *Blomker*, 831 F.3d at 1056, this Court concludes that Plaintiff has plausibly pled a Title VII claim of race discrimination. Specifically, he has "alleged that he suffered [an] adverse employment action[] with tangible negative consequences and that similarly situated white individuals were treated more favorably than he [was]." *Jones v. City of St. Louis, Mo.*, 555 F. App'x 641, 642 (8th Cir. 2014) (unpublished) (reversing and remanding district court's dismissal of plaintiff's race discrimination and retaliation claims for failure to state a claim).

---

considers Plaintiff's constructive discharge allegations as part of his race discrimination and retaliation claims.

First, with respect to an adverse employment action, Plaintiff has plausibly alleged constructive discharge. *See MacGregor*, 373 F.3d at 928. "To *prove* a constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing h[im] to quit." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 418 (8th Cir. 2010) (emphasis added). "An employee must, however, grant h[is] employer a reasonable opportunity to correct the intolerable condition before []he terminates h[is] employment." *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1132 (8th Cir. 2014) (quoting *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 534 (8th Cir. 2008)).

Here, Plaintiff has adequately pled that SPPS created intolerable working conditions that forced him to resign because the risk of staying and losing tenure and benefits if he was fired was simply too great. Plaintiff believed he could be fired at any time, not only because his existing disciplinary actions were "'fireable' offenses," but also because he worked in constant apprehension of being investigated or disciplined for doing his job, potentially leading to even more "fireable" disciplinary actions. (Compl. ¶ 37.) And, critically, Plaintiff pleads that firing "would have [had] a material effect on his future employment, affect his tenure status and affect his retirement benefits." (*Id.*)  These allegations, especially when combined with his allegations as to other aspects of his working conditions, such as getting an unfair share of students with disciplinary problems placed in his classroom and getting only 24 hours to decide whether to transfer, among others, adequately pleads a constructive discharge. *Cf. Phillips v. Collings*, 256 F.3d 843, 849 (8th Cir. 2001) ("[W]e consider the cumulative effect of [defendant's] discriminatory actions rather than determining whether

12

any individual action upon which the claim relies was sufficiently adverse." (citing *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 2001))). With respect to giving SPPS an opportunity to correct these issues, the complaint pleads that Plaintiff complained to Gruenewald about not being included in the investigations or allowed to give his side of the story, challenged the results of the disciplinary actions, and even sent e-mails that went unanswered.

Second, Plaintiff has also adequately pled circumstances that permit an inference of discrimination. He alleges that he was treated less favorably than similarly situated Caucasian individuals, pointing to at least three specific examples of comparator evidence. Like in *Jones v. City of St. Louis, Mo.*, where the Eighth Circuit reversed and remanded the district court's dismissal for failure to state a claim, Plaintiff alleges that Caucasian individuals "were not subjected to the same level of scrutiny and review as he had been." *Jones*, 555 F. App'x at 642. Specifically, Plaintiff points to a similarly situated Caucasian first grade teacher who was not investigated for how she handled student misconduct, and asserts that no Caucasian teacher was asked to provide a doctor's note for calling in sick, as he was. Additionally, Plaintiff alleges that "[n]o other teachers had disciplinary problem students placed in their rooms for days without an explanation." (Compl. ¶ 29.) These allegations satisfy the requirement that a plaintiff must claim disparate treatment to survive a motion to dismiss.[4] *See Wilson v. Ark. Dep't of Human Servs.*, 850 F.3d 368, 371 (8th Cir.

---

[4] On this point, SPPS cites—and mentioned at oral argument—*Hager v. Ark. Dep't of Health*, which reversed the district court's denial of a motion to dismiss a § 1983 claim, for the proposition that "failure to plausibly plead [disparate treatment] requires dismissal." (Def.'s Mem. [Doc. No. 7] at 15.) However, SPPS's reliance on *Hager* is

2017). In sum, the Court concludes that Plaintiff has stated a Title VII claim for race discrimination.

SPPS urges the Court to reach a contrary conclusion, but it erroneously focuses on Plaintiff's purported failure to plead sufficient facts to establish each and every element of the prima facie case. (*See* Def.'s Mem. at 8–18.) But as already described, "a plaintiff need not plead facts establishing a prima facie case of discrimination under *McDonnell Douglas* in order to defeat a motion to dismiss." *Hager*, 735 F.3d at 1014. The elements of *McDonnell Douglas* are useful to the extent that they shed light on the plausibility of the claim. Indeed, "[u]nder the 'simplified notice pleading standard' that governs *McDonnell Douglas* . . . claims, summary judgment motions—not motions to dismiss—should dispose of most unmeritorious claims." *Wilson*, 850 F.3d at 372. For this reason, SPPS's heavy reliance on summary judgment case law and arguments that Plaintiff cannot prove discrimination are misplaced. For the reasons already stated, Plaintiff has adequately *pled* a claim for race discrimination under Title VII.

### 2. Retaliation

The opposition clause of Title VII's anti-retaliation provision prohibits "discriminat[ion] against" an employee who "has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a); *See Burlington N.*, 548 U.S.

---

misplaced. There, the Eighth Circuit noted that the plaintiff had not "allege[d] facts showing that similarly situated employees were treated differently," but instead relied merely on "two conclusory allegations of gender discrimination: (1) she 'is a victim of gender discrimination;' and (2) she 'was discharged under circumstances summarily [sic] situated nondisabled males . . . were not." 735 F.3d at 1015 (alterations in original). Here, plaintiff provides concrete factual allegations supporting his contention of disparate treatment, as described above.

at 56. To establish a prima facie case of retaliation, a plaintiff must show: "(1) that []he engaged in activity protected under Title VII; (2) that an adverse employment action was taken against h[im]; and (3) that there was a causal connection between the two." *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 632 (8th Cir. 2005) (citing *Brower v. Runyon*, 178 F.3d 1002, 1005 (8th Cir. 1999)). With respect to the first element, the Eighth Circuit "appl[ies] the retaliation provisions of § 2000e–3(a) broadly to cover opposition to employment actions that are not unlawful, as long as the employee acted with a good faith, objectively reasonable belief that the practices were unlawful." *Blomker*, 831 F.3d at 1059. That is, "[t]o demonstrate the presence of protected opposition, a plaintiff must show a good faith reasonable belief that his employer engaged in a discriminatory employment practice." *Evans v. Kansas City, Mo. Sch. Dist.*, 65 F.3d 98, 100 (8th Cir. 1995).

Keeping these elements in mind, this Court finds that Plaintiff has stated a claim for retaliation under Title VII. Construing all reasonable inferences in his favor, Plaintiff has plausibly alleged that he opposed an employment practice which he—objectively reasonably and in good faith—believed to be unlawful. At a school board meeting on May 20, 2014, Plaintiff opposed the SPPS policy that required teachers to discipline African American students less severely than Caucasian students. While Plaintiff alleges that he voiced his concern about the negative consequences he believed this policy might have on African American students, importantly, Plaintiff also alleges that SPPS's policy affected his *own* duties and job performance, stating that because he "did not support [SPPS]'s racial equity policy, he could not fulfill his employment duties, specifically, implement the goals and objectives of the District and the school and/or program to which assigned." (Compl.

15

¶ 14.) A policy that affects an employee's ability to "fulfill his employment duties," is arguably and plausibly an employment practice.[5] Moreover, Plaintiff has plausibly pled "a good faith, objectively reasonable belief" that the policy he opposed was unlawful.[6] *Blomker*, 831 F.3d at 1059. And, again, a claim for retaliation may lie even when the opposition is to a practice that is not, in fact, a violation of Title VII. *See id.*

Next, as explained above, Plaintiff has plausibly pled an adverse employment action—constructive discharge—and the Court further finds that he has plausibly pled that retaliation was the "'but for' cause of the adverse employment action." *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013)); *see Wilson*, 850 F.3d at 372 (stating that to survive a motion to dismiss a "plaintiff must allege but-for causation.") Here, Plaintiff states that "investigations . . . started happening *because* he did not support [SPPS]'s racial equity policy." (Compl. ¶ 13 (emphasis added); *see, e.g.*, *id.* ¶ 26

---

[5] Relying on *Evans*, SPPS argues that Plaintiff's retaliation claim fails as a matter of law for failure to allege opposition to an "employment practice." (*See* Def.'s Mem. at 19–21.) But SPPS's reliance on *Evans* at this juncture is misplaced. First, *Evans* did not address the adequacy of pleading at the motion to dismiss stage. There, the Eighth Circuit reversed a bench trial in favor of the plaintiff. *Evans*, 65 F.3d at 101–02. And second, *Evans* is distinguishable because, after discovery and trial, the Eighth Circuit found that "[r]ather than relating to the terms and conditions of Evans' employment," his opposition to a school policy "pertained to Evans' conflicting vision for the school." *Id.* at 101. As already explained, Plaintiff alleges he opposed the "racial equity" policy not only because of its effect on the student body, but also because of how it affected *his* employment.

[6] Importantly here, the SPDHR concluded that Plaintiff's opposition is protected activity "under Chapter 183.10 of the Saint Paul Human Rights Ordinance." (Compl. at 24.) It is therefore reasonable to infer that Plaintiff—objectively reasonably and in good faith—believed that the racial equity policy was unlawful, an argument he seems to advance in his brief in opposition. (Pl.'s Opp'n at 9 ("[L]egitimate concerns and challenges made by an employee to a work place policy is statutorily protected activity under Chapter 183.10 of the Saint Paul Human Rights Ordinance.").)

("Defendant was retaliating against Plaintiff because of his race."); *Id.* ¶ 35 ("Plaintiff was retaliated against by Defendant because of his race . . . .").) This adequately alleges "but for" causation. *See Wilson*, 850 F.3d at 373 ("Construed most favorably to [plaintiff], and viewing the complaint as a whole, the phrase 'victim of . . . retaliation, after having complained' alleges but-for causation." (second alteration in original)). And Plaintiff further supports an inference of "but-for" causation with several factual assertions, including his utter lack of disciplinary problems prior to voicing his opposition, and the fact that he disputes SPPS's conclusion that he violated school policies when it disciplined him. In sum, Plaintiff has plausibly pled that he suffered retaliation in violation of Title VII.

Like the race discrimination claim, SPPS would have this Court reach a different conclusion. However, SPPS again primarily relies on case law dealing with summary judgment and beyond, and parses each of Plaintiff's assertions to argue that he cannot prove a prima facie case of retaliation. But the Court again stresses that Plaintiff is not required to prove a prima facie case in his complaint, and that the "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Id.* at 370 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)). For the reasons already stated, Plaintiff has stated a claim for retaliation under Title VII.

### 3. Hostile Work Environment

Though a hostile work environment is just one way to show race discrimination under Title VII, it is a "'distinct cause[] of action' that demands a different evidentiary showing," and one that can exist without an adverse employment action. *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 827 (8th Cir. 2017) (alteration in original). To establish a prima

17

facie case of a hostile work environment, a plaintiff must ultimately show "that: (1) []he is a member of a protected group; (2) unwelcome harassment occurred; (3) a causal nexus existed between the harassment and h[is] protected group status; and (4) the harassment affected a term, condition, or privilege of employment." *Hesse*, 394 F.3d at 629. However, "[t]he standards for a hostile environment are demanding, and 'conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment.'" *Alvarez*, 626 F.3d at 420 (quoting *Alagna v. Smithville R–II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003)). Indeed, for a defendant's conduct to be actionable as harassment under Title VII, the "alleged harassment must be 'so intimidating, offensive, or hostile that it poisoned the work environment.'" *Blomker*, 831 F.3d at 1057 (quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999)).

Here, even drawing all reasonable inferences in Plaintiff's favor, this Court concludes that his complaint falls short of plausibly alleging that SPPS's actions were "severe or pervasive enough to create an objectively hostile or abusive work environment." *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 801 (8th Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)). Plaintiff argues that he was subjected to a hostile work environment because:

> [H]e was ignored when filling out disciplinary referrals for troubled students, [SPPS] launched multiple frivolous investigations against Plaintiff, [SPPS] treated Plaintiff differently than other similarly situated employees, [and SPPS] launched an investigation into whether Plaintiff had started an altercation with a student without receiving any input or hearing Plaintiff's side of the story.

(Pl.'s Opp'n at 11). But, fatal to Plaintiff's claim, by his own admissions, these "investigations and disciplinary actions were an *insult* to Plaintiff who, up until the point he

challenged [SPPS]'s racial equity policy[,] was a good teacher with no investigations or disciplinary actions taken against him." (*Id.* (emphasis added).) Adequately pleading a hostile work environment simply requires more than alleging that Plaintiff was insulted. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (cautioning that Title VII is not a "general civility code."). To survive a motion to dismiss, the facts alleged in Plaintiff's complaint must "show harassment so severe or pervasive that they satisfy the high threshold for a [racial] harassment claim based on hostile work environment." *Blomker*, 831 F.3d at 1057. On these facts, this Court concludes that Plaintiff's complaint fails to meet this threshold. Accordingly, Count III of his complaint must be dismissed.

In sum, this Court grants SPPS's Motion to Dismiss as to Count III of Plaintiff's Amended Complaint (hostile work environment), but denies the motion in all other respects.

### III. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) [Doc. No. 5] is **DENIED IN PART AND GRANTED IN PART**, as detailed herein.


Dated: December 4, 2017         s/Susan Richard Nelson
                                SUSAN RICHARD NELSON
                                United States District Judge