# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Aaron A. Benner,<br><br>    Plaintiff,<br><br>v.<br><br>St. Paul Public Schools, I.S.D. #625, and Lisa Gruenewald, *in her official and individual capacities*,<br><br>    Defendants. | Case No. 17-cv-1568 (SRN/KMM)<br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

J. Ashwin Madia, Cody Blades, and Joshua Newville, Madia Law LLC, 333 Washington Avenue North, Minneapolis, MN 55401 for Plaintiff.

Sarah Bushnell, Jeffrey Markowitz, and Kari Marie Dahlin, Arthur Chapman Kettering Smetak & Pikala, PA, 81 South Ninth Street, Minneapolis, MN 55402 for Defendants.

SUSAN RICHARD NELSON, United States District Judge

   This case aptly illustrates the adage that there are always "two sides to every story." On the one hand, Plaintiff Aaron Benner ("Benner") claims that, after he (a tenured African-American elementary school teacher) spoke against Defendant St. Paul Public Schools' ("SPPS") "racial equity policy" during a widely-covered May 2014 school board meeting, SPPS worked with his new Principal (Defendant Lisa Gruenewald) to "paper" his then-impeccable record with "bogus" investigations and disciplinary measures, so as to make him a ripe target for termination. After enduring this "retaliation" for the entire 2014-2015 school year, and fearing that he could be fired at any moment, Benner resigned from SPPS in August

2015 and instead began working at a local charter school. In Benner's view, all of this occurred because, as an African-American school teacher publicly standing against a District policy aimed at aiding African-American students, he presented a unique "threat" to SPPS's policy goals.

On the other hand, Defendants contend that any "disciplinary measures" they took against Benner were wholly unrelated to either his race or his public policy stances, and that each "disciplinary measure" was fully justified by Benner's (allegedly improper) in-school actions. Moreover, Defendants argue, Benner was not "forced" to resign, or otherwise "retaliated against." Rather, Defendants submit, at the end of the 2014-2015 school year Benner simply chose a job that better suited his career aspirations.

Defendants now move for summary judgment as to all four of the claims Benner has brought against them, arguing that the factual record is sufficiently clear for the Court to rule in their favor as a matter of law.

The Court largely disagrees; the factual disputes in this case are simply too wide, and too important, for the Court to deny Benner a jury trial as to all of his claims. However, because of controlling legal standards, Defendants are entitled to summary judgment on two of the claims Benner has brought against them (Title VII retaliation and First Amendment retaliation). The other two claims (Minnesota Whistleblower Act retaliation and Title VII race discrimination) will proceed to trial. The Court explains its reasoning at greater length below.

## I.     BACKGROUND

For ease of understanding, the Court will divide this factual narrative into four parts. *First*, the Court will discuss the relevant factual events up through, and including, Benner's

May 20, 2014 speech to the St. Paul school board. In so doing, the Court will also provide some background on the "suspension gap" and "racial equity" issues that undergirded Benner's speech. ***Second***, the Court will detail the various investigations, reprimands, and alleged hardships that Benner endured during the 2014-2015 school year, while he was a fourth-grade teacher at John A. Johnson Elementary School in St. Paul. ***Third***, the Court will recount how these incidents resulted in Benner leaving SPPS. ***Finally***, the Court will review this litigation's procedural history.

Because this case is in a summary judgment posture, the Court will consider this factual background "in the light most favorable" to Benner, and will "mak[e] every reasonable inference" in Benner's favor. *Bradford v. Palmer*, 855 F.3d 890, 892 (8th Cir. 2017).

### A. Relevant Events Prior to the 2014-2015 School Year

#### 1. *The "Suspension Gap" and SPPS's "Racial Equity" Response*

Before delving into the details of this case, the Court will first discuss the educational policy problem known as the "suspension gap," and how SPPS was attempting to remedy this problem during the years relevant to this litigation. This background is essential to understanding why Benner believes his May 20, 2014 speech posed a "threat" to SPPS's then-leadership, such that they would have any reason to "retaliate" against him.

It is well established that, in many urban school districts across the country, including SPPS, the suspension rate for African-American students is vastly disproportionate to the percentage of African-American students in the school district. (*See* Defs.' Ex. 7 [Doc. No. 78-1] ("May 29, 2013 Minnesota Spokesman-Reporter Article") (noting that, according to a UCLA research report, "St. Paul was among several U.S. urban school districts . . . where it

3

was found that Black students in 2009-10 were suspended at least three times more often than Whites, and almost twice as often as Latinos"); *cf.* Michael Rocque & Raymond Paternoster, *Understanding the Antecedents of the "School-to-Jail" Link: The Relationship Between Race and School Discipline*, 101 J. Crim. L. & Criminology 633, 651 (2011) (finding that, even as early as elementary school, "[b]lack students [are] . . . more than two times as likely to receive at least one disciplinary report compared with students of all other races").) This disparity is often called the "suspension gap." (*See, e.g.*, Defs.' Ex. 6 [Doc. No. 78-1] ("Summer 2012 City Journal Article") at 5.) There is a vigorous public debate over the causes of this gap, as well as over what, if anything, should be done about it. *Compare, e.g.*, Derek W. Black, *Reforming School Discipline*, 111 Nw. U. L. Rev. 1, 47-57 (2016) *with* Gail Heriot & Alison Somin, *The Department of Education's Obama-Era Initiative on Racial Disparities in School Discipline: Wrong for Students and Teachers, Wrong on the Law*, 22 Tex. Rev. L. & Pol. 471 (2018).

In recent years, SPPS has undertaken numerous policy efforts to try and reduce its "suspension gap." Many of these policy efforts were spearheaded by Valeria Silva, who was SPPS's Superintendent from 2009 to 2016. (*See* Defs.' Ex. 20 [Doc. No. 78-1] ("Aug. 25, 2016 American Public Media Article") at 12; *accord* Silva Dep. [Doc. No. 89-5] at 41 (describing these policies as one of her "top priorities").) For example, in 2009, SPPS began training its teachers in Positive Behavior Interventions and Supports ("PBIS"), which ask teachers to focus on positive reinenforcement for good behavior rather than negative, "punitive" consequences for bad behavior. (*See* Defs.' Ex. 9 [Doc. No. 78-1] ("May 2, 2014 Twin Cities Daily Planet Article").) In 2010, SPPS also hired a consultancy called the Pacific

Education Group ("PEG") to help train the district's (mostly white) teachers and administrators as to how racial awareness could reduce the need for disciplinary measures, especially with respect to African-American students. (*See id.*; *see also* Pl.'s Ex. 156-159 [Doc. Nos. 89-111 to 89-114] (learning materials provided by PEG).)[1]

Most importantly for present purposes, though, in July 2013 SPPS adopted an official "racial equity" policy. (*See* Pl.'s Ex. 22 [Doc. No. 89-34] ("SPPS Racial Equity Policy").) At the time, local press reports described the policy as "groundbreaking." (*See* Pl.'s Ex. 161 [Doc. No. 89-115] ("July 15, 2013 Pioneer Press Article").) Although the exact content of this policy was somewhat amorphous, "racial equity" appeared to be a multi-faceted effort aimed at "eliminating" SPPS's "institutional racism," so as to "increase achievement . . . for *all* students, while narrowing the gaps between the highest-and-lowest-performing students." (SPPS Racial Equity Policy at 1 (emphasis in original); *see also* July 15, 2013 Pioneer Press Article ("[The policy] says the district will work to recruit and retain a 'racially conscious and culturally competent' staff and embrace 'culturally responsive' practices in the classroom and beyond.").) As part of this policy, SPPS also appeared to encourage its administrators and

---

[1]    In conducting these trainings, PEG relied on a philosophy called "critical race theory," or "CRT." Although this philosophy eschews simple definition, one prominent legal scholar has defined CRT "as a form of oppositional scholarship" that "challenges the universality of white experience/judgment as the authoritative standard that binds people of color and normatively measures, directs, controls, and regulates the terms of proper thought, expression, presentment, and behavior." John O. Calmore, *Critical Race Theory, Archie Shepp, and Fire Music: Securing an Authentic Intellectual Life in a Multicultural World*, 65 S. Cal. L. Rev. 2129, 2160 (1992).

       For example, in the SPPS context, a CRT-driven PEG training might ask teachers "to explore their implicit biases," and to "preference their opinion with [statements like] 'as a white man, I believe . . .,' or 'as a black woman, I think . . .'" (Pl.'s Ex. 163 [Doc. No. 89-116] ("May 27, 2015 City Pages Article") at 5).)

principals to collect race-specific data and then focus on reducing the racial disparities measured in that data, particularly with respect to African-American and white students. (*See, e.g.*, Pl.'s Ex. 158 [Doc. No. 89-113] ("Guide for Principals Implementing Racial Equity") at 2.) For instance, one internal SPPS document from the 2013-2014 school year appeared to encourage school administrators to reduce "suspensions" and "office discipline referrals" for "African-American male students" and/or "students of color" by specific numeric percentages over the course of the school year. (*See* Pl.'s Ex. 155 [Doc. No. 89-110] ("SPPS PBIS Behavior Goals"); *accord* Silva Dep. at 150-51.) Similarly, during at least one school year, SPPS provided a financial bonus to principals who "reduced suspensions for students of color." (*See* May 2, 2014 Twin Cities Daily Planet Article (describing this policy, before then noting that it was "discontinued" after the 2012-2013 school year); *accord* Silva Dep. at 98-99).)

SPPS's "racial equity" policy provoked controversy, at both a local and national level. (*See generally* Defs.' Ex. 4-20 (various national and local newspaper articles describing community responses to the policy).) In recent years, moreover, SPPS appears to have modified (but not eliminated) its policy in response to a variety of critiques and suggestions. (*Id.*)

## 2. *Benner Begins to Critique SPPS's Implementation of "Racial Equity"*

With this context in mind, the Court now turns to Aaron Benner. Benner is an African-American elementary school teacher who began his teaching career with SPPS in 1995. (*See* Defs.' Ex. 2 [Doc. No. 78-1] ("Benner Resume").) After receiving tenure from SPPS in 1999 (*see* Defs.' Ex. 1 [Doc. No. 78-1] ("Letter Conferring Tenure")), Benner took a leave of

absence to teach at a local charter school called Community of Peace Academy. (*See* Benner Resume.) However, in 2007, Benner returned to SPPS. Upon his return, Benner taught at Benjamin E. Mays Elementary School for five years, before then transferring to John A. Johnson Elementary School ("JAJ") in the summer of 2013. (*Id.*)

Benner is, by all accounts, a respected and enthusiastic classroom instructor. (*See, e.g.*, Pl.'s Ex. 53 [Doc. No. 89-51] ("Benner Evaluations") (highly positive evaluations that Benner received during the years 1996-1999); Defs.' Ex. 31-32 [Doc. No. 78-1] (Benner's nomination for "2005 Minnesota Teacher of the Year"); Defs.' Ex. 34-36 [Doc. No. 78-1] (enthusiastic letters of recommendation Benner received in 2014 and 2015).) Moreover, until the 2014-2015 school year, Benner had never received any kind of formal discipline from his supervisors within the SPPS system, and there is no indication that he was in any way reprimanded during the years he taught at Community of Peace. (*See* Pl.'s Ex. 109 [Doc. No. 89-80] ("Defs.' Responses to Pl.'s Requests for Admission") at 5.)[2]

---

[2] Defendants correctly note that Benner was "investigated" by SPPS during the 2013-2014 school year for allegedly telling a student's family that the student could stay home when Benner was not in school. (*See* Defs.' Ex. 36-37 [Doc. No. 78-1] ("Benner 2013-2014 School Year File").) However, this brief investigation did not result in any formal discipline. (*Id.* at 1 (closing the March 2013 investigation for being based on "unsubstantiated" allegations).)

Similarly, evidence in the record shows that some of Benner's colleagues did not think as highly of his abilities as others. (*See, e.g.*, Kaufman Dep. at 73-74 (describing "continual" "coaching conversations" she had with Benner during the few months she served as interim Principal of JAJ Elementary in spring 2014); Gruenewald Dep. at 157 (describing reports she received from three teachers about Benner's lack of teaching acumen).) But, again, this evidence does not reflect a prior "disciplinary" record on Benner's part.

Benner is also notable because he is one of the few African-American teachers in a school district that is over one-third African-American. (*Compare* Silva Dep. at 44 (describing SPPS as "about 30 to 40 percent African-American, 20 to 30 percent Hmong kids, and about 20 to 30 percent white kids") *with id.* at 166 (noting that "86% of [SPPS's] teachers are white"); *see also* Benner Dep. [Doc. No. 89-1] at 320 (observing that he is "one of the few black male teachers in St. Paul," which he compared to "being a unicorn").) At JAJ Elementary, for instance, Benner was one of two African-American teachers (out of 30 teachers total) and was the only African-American male teacher. (*See* Pl.'s Ex. 107 [Doc. No. 89-79] ("Def.'s Answers to Pl.'s Requests for Admission") at 4; *see also* Pl.'s Ex. 1 [Doc. No. 92] ("2014-2015 JAJ Attendance Records") (showing number of teachers at JAJ Elementary).)

In any event, sometime during 2011, Benner began to notice that disruptive behavior, particularly among African-American boys, was not being treated with as much seriousness as he believed necessary. (*See* Benner Dep. at 10-25.) Benner voiced concerns about this issue in both private and public forums. For instance, after experiencing an African-American student "assault" him on the playground and face virtually no punishment, Benner went to a SPPS school board meeting on December 13, 2011 to speak against lax disciplinary policy, and attempts to blame "insensitive white teachers," rather than the "Black community," for African-American students' misbehavior. (*See* Defs.' Ex. 25 ("Audio Recording of December 13, 2011 Meeting") at 23:55 to 27:00; *see also* Defs.' Ex. 24 [Doc. No. 78-1] ("Minutes of December 13, 2011 Meeting") at 5 (summarizing Benner's remarks as "hold children to higher standards, hold Black community responsible for crisis of achievement gap, have

serious dialogue with the community").) At the time he made this statement, Benner had "never heard of racial equity," or "PEG." (Benner Dep. at 18-19.)

Benner's frustration over this issue grew upon SPPS's adoption of the aforementioned "racial equity policy" in 2013, while Benner was in his first year at JAJ Elementary. In particular, Benner contended that this policy was leading to "quotas" on African-American suspensions and punishments (but not for students of other races), which Benner believed to be both illegal and ineffective. (*See, e.g.*, Benner Dep. at 215, 222-225, 237-45 (describing specific examples of unequal disciplining of students by race during his time in Ben Mays and JAJ Elementary, and further explaining that "it was impossible to maintain a safe classroom and close the achievement gap and teach when kids are not being held accountable"); *see also* Ritten Dep. [Doc. No. 89-119] at 17-22, 58-62, 77 (fellow teacher of Benner's who testified that, under SPPS's "racial equity policy," teachers were essentially told to "decrease the amount of [behavior] referrals to black students," and that this policy helped contribute to "chaos" in JAJ Elementary); Rapp Dep. [Doc. No. 89-7] at 101-03 (same).) Benner also believed that, by not suspending students for certain misbehaviors (or even recording the disciplinary referrals), SPPS was effectively engaging in "fraud" with respect to its disciplinary statistics. (*See, e.g.*, Benner Dep. at 222-23.)

At the time, Benner faced some private criticism for his position. For example, Benner accuses the then-interim Principal of JAJ Elementary, Judy Kaufman, of telling him in spring 2014 that he would be "out of a job" if he did not "get on board with the racial equity policies." (Benner Dep. at 38-39; *accord* Rapp Dep. at 97-98, 112-13 (confirming that Benner

contemporaneously told her about this incident); *but see* Kaufman Dep. [Doc. No. 89-9] at 57 (denying that she made any such comment to Benner).)

Near the end of the 2013-2014 school year, however, Benner made his disagreement with SPPS's "racial equity" policies even more public. Specifically, Benner joined forces with four other SPPS teachers (none of whom were African-American) to propose a countervailing policy to "racial equity," called the "high expectations policy." Among other things, the teachers' plan advocated creating a culture of "empowerment and unity around high expectations and high standards for all students, regardless of race, income, or ethnicity," instead of a "climate of fear, divisiveness, and uncertainty among educators around discipline and race," which was apparently fostered by PEG-style "racial awareness" trainings. (Pl.'s Ex. 114 [Doc. No. 89-84] ("May 6, 2014 E-Mail in Support of High Expectations Policy") at 1.) In a May 6, 2014 e-mail announcing their proposed policy, Ian Keith (another member of the group of five) encouraged anyone who supported the teachers' ideas to "join them" at an upcoming school board meeting, on May 20, 2014, where the teachers would share brief remarks in support of their proposal. (*Id.*)

This organizing effort was immediately noticed by SPPS's top leadership, including then-Superintendent Silva, and one of SPPS's then-school board members, Keith Hardy. For instance, the night of Keith's original e-mail, Hardy forwarded Keith's message to Silva with the line, "I don't understand why the continuous rancor. The board will stand behind you and your team." (Pl.'s Ex. 113 [Doc. No. 89-83] ("May 6, 2014 Hardy E-mail to Silva").) Silva, in turn, forwarded the message to her cabinet and stated, "be aware." (Pl.'s Ex. 114 [Doc. No. 89-84] ("May 7, 2014 Silva E-mail to Cabinet").) Further, after two of Silva's advisors told

her that she should "get ahead of this," Silva approved a plan to "reach out to those that have a different narrative [than the five teachers]," so that they could share their perspective at the school board meeting. (*Id*. at 9 ("May 7, 2014 Silva E-mail to Bierman").) Notably, during this series of e-mail exchanges, one of Silva's assistant superintendents, Theresa Battle, specifically stated that SPPS "need[ed] a counter narrative to Aaron Benner," and recommended that Silva ask if "other African American men . . . will come and speak" in support of SPPS's "racial equity" efforts. (*Id*. at 7 ("May 7, 2014 Battle E-mail to Silva").)[3]

Seemingly as a result of these e-mails, several individuals, ranging from SPPS students to local community leaders, agreed to speak in defense of SPPS's "racial equity" policies at the May 20 school board meeting. (*See generally id*. (e-mail exchanges between SPPS administrators, school board members, and others, in response to Keith's original May 6 message).)

### 3. *Benner Reports His Concerns with SPPS's "Racial Equity" Policy at the May 20, 2014 School Board Meeting*

On the night of May 20, 2014, Benner and his four compatriots (along with some supporters of theirs) arrived at the school board meeting. To their surprise, the meeting room was full. (*See* Benner Dep. at 222 ("We really thought that nobody would be there, at the school board meeting.").) Indeed, as the video evidence in the record confirms, the meeting room was packed with boisterous attendees, many of whom were wearing "purple" in a display of solidarity with SPPS's "racial equity policy." (*See generally* Defs.' Ex. 27 ("Video

---

[3]  The Court also notes that Battle is herself an African-American woman, and, according to Silva, was generally "very concerned about African-American issues." (Silva Dep. at 74.)

Recording of May 20, 2014 Meeting") at 0:00 to 1:10:00; *see also* Benner Dep. at 216 ("The district, either through an e-mail or fliers, told people to wear purple . . . to show that you're in unity against these teachers [proposing the High Expectations Policy].").) Benner's new principal, Lisa Gruenewald (who would officially start at JAJ Elementary in the fall), was among those in attendance. (*See* Gruenewald Dep. [Doc. No. 89-2] at 30.) Benner also noticed that "people on the superintendent's cabinet [were] all wearing purple," and that "black pastors that [Benner] went to high school with" were "just sitting there [waiting to] hear[] [him] speak." (Benner Dep. at 217-18.)

Nevertheless, during the time for public comment, Benner stood up and passionately delivered the following two-minute statement, which he characterized as a "complain[t] about the separate but equal new illegal policies in St. Paul." (*Id.* at 215.)[4]:

> Good evening. 'I have a dream that my four children will one day be judged by the content of their character and not by the color of their skin.' Now, obviously those are not my words, but those of the late Dr. King in 1963. So, here we are, 51 years later, and currently in our schools, lack of character is now being excused due to students' skin color.

> I made a similar plea to the School Board two and a half years ago and I'm here again because I believe we are crippling our black children by not holding them to the same expectations as other students. I am here because black students can, and should, behave in *any* classroom, regardless of the race, gender, or ethnicity of their teacher. I am here again because we can do a better job in St. Paul of helping our black students and others. We need a no excuses, failure is not an option, tough love approach for our most troubled youth, as outlined in the high expectations policy proposal.

---

[4]     Although Benner did not use the words "racial equity" in his speech, he contends that, viewed in context, "everybody and their mother knew what [he and his four compatriots] were there for." (*Id.* at 215.) Benner also contends that, in comparison to his December 2011 speech to the school board, which focused on the "Black community," this May 2014 speech was aimed at *SPPS policy*. (*Id.* at 18-19.)

The direction of the St. Paul Public Schools today makes Dr. King's wish a distant dream, as bad behavior is attributed to a litany of excuses, such as, relationships aren't established between teachers and black students; PBIS is not taught with fidelity; teachers and their 'white privilege'; and, my favorite excuse, 'culturally responsive teaching' is not being used.

What does 'culturally responsive teaching' look like in the classroom? Not too many people seem to know, as this term was [only] coined in 1994.

However, I do know that cussing out your teacher is not black culture; refusing to do work is not black culture; not following directions is not black culture; hitting other students is not black culture; and assaulting your teacher is not black culture.

So, I'm asking this school district to ask the black community, my community, what is black culture, and which behaviors will not be tolerated in our schools. We must engage our parents. Do not be afraid to be called a racist. We must engage our parents. We are losing our black kids to the streets. It's already hard for these kids. Don't make excuses for them, because the police will not have excuses when they lock them up. Please, I don't want to come back here – I don't want to be back here in two-and-a-half years with the same message.

(Video Recording of May 20, 2014 Meeting at 17:44 to 20:00; *see also* Defs.' Ex. 28 [Doc. No. 78-1] ("Benner Speech Transcript").)

After Benner and his four compatriots finished speaking, around two dozen other individuals gave remarks in favor of SPPS's "racial equity" policy, and related efforts. (*See* Defs.' Ex. 26 [Doc. No. 78-1] ("May 20, 2014 Minutes")) (listing all of the speakers during the hour-long public comment portion of meeting).)

The opening sentence of an article in the next day's *Minneapolis Star-Tribune* aptly summarized the meeting's tone: "A group of St. Paul teachers went before the school board Tuesday to air concerns about lax discipline policies – only to be drowned out by parents and minority leaders who commended the district for its racial equity work." (Pl.'s Ex. 116 [Doc. No. 89-86] ("May 21, 2014 Star-Tribune Article").) Notably, in describing the "drowned out"

"group of St. Paul teachers," the *Star-Tribune* solely quoted Benner. (*See id.* ("But Aaron Benner, a fourth-grade teacher at [JAJ Elementary] who is black, said that the district was doing a disservice to the children by not holding them to the same standard as students from other ethnic groups. 'Refusing to do work is not black culture,' he said. 'Assaulting your teacher is not black culture.'").)

Silva forwarded the article to the school board, among many others, that day. (*See, e.g.*, Pl.'s Ex. 116 ("May 21, 2014 Silva E-mail to Polsfuss") at 1.) In response, SPPS's Chief Academic Officer, Matthew Mohs, e-mailed Silva and others with the comment, "Aaron Benner is a master at being quotable." (*See* Pl.'s Ex. 115 [Doc. No. 89-85] ("May 21, 2015 Mohs E-mail to Silva").) Silva replied to Mohs with the word, "Yes." (*See* Pl.'s Ex. 116 at 13 ("May 21, 2015 Silva E-mail to Mohs").)

More still, a few weeks later, Silva requested that one of her aides create a video clip of the May 20 Benner speech to share with the consultants from PEG. (*See* Pl.'s Ex. 119 [Doc. No. 89-89] ("June 17, 2014 Video Clip E-mail Chain"); *see also* Silva Dep. at 89-90 (explaining these e-mails).)[5]

Although Silva contended at her deposition that this focus on Benner had nothing to do with either his race or outspoken opinions, she did acknowledge that, when it came to critiquing the district's "racial equity" policies, Benner was "the most vocal African-American teacher" in the District. (*Id.* at 47.)

---

[5]     In this exchange, Silva also requested a video clip of Chong Thao, another SPPS teacher who spoke in favor of the High Expectations Policy. Thao is a woman of Hmong descent. Silva did not request video clips of the other three teachers, all of whom are white males.

**4.** ***Benner and Others Attempt to Work with SPPS the Summer Following the School Board Meeting, To No Avail***

About a month after the school board meeting, Silva e-mailed Benner and his four colleagues. In her e-mail, Silva thanked the teachers for their comments, and invited them to participate in an SPPS committee called "Solutions in Action," which sought to "work[] with [the community] to develop programs and practices to reduce disproportionate suspensions and referrals, while creating engaging classrooms for all students." (Defs.' Ex. 29 [Doc. No 78-1] ("June 10, 2014 Silva E-mail to Teachers").) The teachers participated in the Solutions in Action committee that summer. (*See* Silva Dep. at 29-31.)

Notably, during one of those meetings, Silva spoke with Benner and requested that the two of them have a "one-on-one meeting," where they could discuss each other's viewpoints. (*See* Benner Dep. at 229; Silva Dep. at 32.) Silva did not request an analogous "one-on-one meeting" with any of the other teachers in the group of five. (*See* Benner Dep. at 229 ("[Silva] could have asked the other teachers in the summer of 2014, but she only asked to see me, which I [found] kind of peculiar.").) Still, Benner agreed to meet Silva at St. Paul's annual "Rondo Days" celebration, in mid-July 2014. (*Id.*) During the meeting, which lasted "almost two hours" and which both parties describe as "friendly," Benner further expounded upon his May 20 speech, and explained to Silva why he believed "the racial equity policies, [and their] implementation in St. Paul, [was] against the law." (Benner Dep. at 233-34; *cf.* Silva Dep. at 33 (stating that Benner "was concerned that PEG and the District were setting low expectations for African-American students").) Silva disagreed with Benner's assessment, and further chided Benner that "[my] mostly all black cabinet" "thinks you're crazy." (Benner

Dep. at 230.) At the end of the meeting, though, Silva gave Benner her phone number and encouraged him to contact her, and not the media, if he had "any problems." (*Id.* at 231; *accord* Pl.'s Ex. 33 [Doc. No. 89-37] ("July 20, 2014 E-mails Between Benner and Silva") (e-mail in which Benner confirmed that he had Silva's correct cell phone number).)

In early August 2014, following the "Solutions in Action" meetings, the five teachers jointly sent Silva and other SPPS leaders a lengthy e-mail explaining why they still did not agree with key aspects of SPPS's "racial equity" approach. (*See* Pl.'s Ex. 124 [Doc. No. 89-91] ("Aug. 7, 2014 Teachers E-mail to Silva et al").) Benner also sent his own e-mail to Silva and two other SPPS administrators. (*See* Pl.'s Ex. 123 [Doc. No. 89-90] ("Aug. 6, 2014 Benner E-mail to Silva et al.").) In his e-mail, Benner stated, among other things, "I have made no secret about my criticism of PEG and the district's racial equity policies," and, "progress will truly be made when the district drops PEG as consultants." (*Id.*)

Silva and (then-school board member) Hardy exchanged frustrated e-mails about the teachers' criticism. For example, in response to Benner's e-mail, Hardy wrote Silva, "Oh Aaron…Time for him to attack student underachievement instead of fighting PEG," to which Silva replied, "Time for you to tell him that!" (Pl.'s Ex. 123 at 1 ("Aug. 7, 2014 Hardy to Silva E-mail Exchange").) Similarly, in response to the teachers' joint e-mail, Silva exclaimed, "again, I will tell you that they never took the time to believe." (Pl.'s Ex. 124 at 1 ("Aug. 8, 2014 Silva E-mail to Hardy").)

A few weeks after his e-mail, Benner again reached out to Silva, this time with a request that she meet with him and "several black teachers . . . who would love to have a chance to speak with you regarding the achievement gap and the disparity in suspensions."

(Pl.'s Ex. 125 [Doc. No. 89-92] ("Aug. 12, 2014 Benner E-mail to Silva") at 3-4.) Benner explained that his "role in the meeting would be to ensure that all voices are heard and no attacks are made." (*Id.*) Silva did not respond to Benner. However, it appears from internal e-mails that Silva discussed Benner's e-mail with Hardy and other SPPS administrators, and ultimately decided that it would be unfair to other teachers to give Benner such "incredible access" to the superintendent. (*See* Pl.'s Ex. 125-126 [Doc. Nos. 89-92 to 89-93] ("Aug. 12 and Aug. 13, 2014 Internal SPPS E-mail Exchanges"); *see also* Silva Dep. at 102 ("The discussion was, at the time, don't give him . . . more time. We already had had enough time to discuss this.").)

## B. The 2014-2015 School Year

### 1. *A Brief Primer on Investigations and Teacher Discipline in SPPS in general, and at JAJ Elementary School in Particular*

Now, before discussing the various investigations, disciplinary measures, and other alleged hardships Benner subsequently endured during the 2014-2015 school year, it is worth reviewing how teacher discipline functions in SPPS, particularly with respect to tenured faculty like Benner.

For starters, outside of "incident[s] of a serious nature," such as sexual assault, SPPS attempts to employ a "progressive discipline system" with its teachers. (*See* Defs.' Ex. A [Doc. No. 77-1] ("SPPS 2013-2015 Terms and Conditions of Teacher Employment") at 81.) Specifically, the four "levels of discipline," to be applied "progressively," are "(a) oral reprimand, (b) written reprimand, (c) suspension without pay, and (d) discharge." (*Id.*) When

a teacher receives any kind of written discipline, SPPS's Human Resources department ("HR") will note that in the teacher's "record," or "file," for at least two years. (*Id.* at 82.)

The disciplinary process usually begins when a school principal contacts HR with a complaint about one of their teachers. (*See* Clukey Dep. [Doc. No. 89-3] at 15; Yang Dep. [Doc. No. 89-12] at 14.) HR will then decide if they should "investigate" the incident. (*See* Collins Dep. [Doc. No. 89-6] at 15.) If HR decides to investigate and consider disciplinary action, its representative must abide by the "Seven Tests of Just Cause," which include basic due process considerations like, "interview witnesses," "remember that evidence must be truly substantial, not flimsy or slight, to form a basis for taking disciplinary action," and, notably, "consider [whether the discipline] is reasonably related to the employee's record." (Pl.'s Ex. 100 [Doc. No. 89-77] ("Seven Tests of Just Cause") at 3-4; *see also* Yang Dep. at 13 (confirming that HR investigators are expected to abide by these standards).) At the conclusion of the investigation, the HR investigator must either find the complainant's allegation "substantiated," "unable to be substantiated," or "not substantiated." (*See* Clukey Dep. at 21-23 (explaining that, although there "should be no discipline" when allegations are "not substantiated," HR operates in a "grey area" when allegations are merely "unable to be substantiated").) The HR investigator then proposes a form of discipline to the principal, which the principal may choose to accept or not. (*See id.* at 19, 25.) A teacher has the right to "grieve," or appeal, any reprimand they receive, by way of their union-appointed representative. (*See* SPPS 2013-2015 Terms and Conditions of Teacher Employment at 82.)

Although HR and school principals largely operate on their own with respect to "oral reprimands" and "written reprimands," a school's "Assistant Superintendent"[6] will still receive updates about these kinds of reprimands at weekly staff meetings. (*See* Collins Dep. at 15-22.) Moreover, a principal may talk directly with their Assistant Superintendent about teacher disciplinary matters. (*See id*. at 22-25; Gruenewald Dep. at 37-38.) The District's Superintendent is generally not involved in HR decisions. (*See* Silva Dep. at 107-08.) However, on occasion, the Superintendent may also receive updates about teacher disciplinary matters. (*Id.*)

For perspective, it bears mentioning that, of the 10 incidents concerning tenured teachers at JAJ Elementary that the school's principal reported to HR between 2012 and 2016 (not including the incidents involving Benner, discussed *infra*), HR only investigated five, and, of those five, only four resulted in any kind of "formal discipline." (*See* Pl.'s Ex. W [Doc. No. 89-21] ("2012-2016 JAJ Teacher Discipline Statistics").)[7] Examples of tenured teacher conduct meriting "formal discipline" included (a) "neglect of students who engaged in physical fight leading to one being injured while teacher was elsewhere gathering materials" (oral reprimand); (b) "teacher was aggressive toward students and had to be physically held back from charging toward student" (teacher resigned after HR recommended termination);

---

[6]    In SPPS, each Assistant Superintendent is responsible for approximately 10-20 schools, and serves as a middle man between school principals and the Superintendent. (*See* Collins Dep. at 6-7.) The Assistant Superintendent responsible for JAJ Elementary at all relevant times was a man named Andrew Collins.

[7]    During that same time period, HR received notice of 17 incidents involving non-tenured employees. (*Id*.) HR investigated seven of those incidents, and meted out formal discipline in all seven cases. (*Id*.)

and (c) "teacher instructed students to 'go fight in the hallway,' which turned into a physical fight" (written reprimand). (*Id*.)

Importantly, if a teacher does receive a formal "reprimand" for their actions, that discipline letter may contain language providing "cause" for the school district to discharge that teacher. *See* Minn. Stat. § 122A.41, subd. 4(a) (stating that a tenured teacher "must not be discharged or demoted except *for cause* after a hearing") (emphasis added). Although SPPS "rarely" fires tenured teachers (*see generally* Vollmer Dec. [Doc. No. 77]), Minnesota law does state that the following "infractions" may constitute "cause" for termination: "immoral character," "conduct unbecoming a teacher," and "insubordination." *Id*. at subd. 6(a)(1).

### 2. *In October 2014, Benner Is Investigated and Formally Disciplined for the First Time in his Career, After He Allegedly Reveals "Confidential Information" to a Student's Mother*

On Monday, September 22, 2014, while walking to his classroom, Benner witnessed an "African-American boy grab an African-American girl's hair, pull[] her steady, punch[] her, [and] hit her in her face," such that the girl was knocked "out cold." (Benner Dep. at 49.) Neither student was in Benner's class. (*Id.*) Nonetheless, Benner took the young girl to the nurse's office, and then told his Principal, Lisa Gruenewald, about the attack. (*Id*. at 50.) The following Sunday, Benner decided to call the girl's mother to check in on the girl; Benner had the mother's phone number because he had taught the girl's sister earlier in his career. (*Id*.) When he called the mother, Benner learned that the school had not told the mother about the incident, and that the mother was accordingly "irate." (*Id*. at 51; *accord* Gruenewald Dep. at 55-56 (admitting that, although the school tried to contact the mother, they could not reach

her).) The mother later called the school and expressed her displeasure. (*See* Benner Dep. at 52; Abdur-Salaam Dep. [Doc. No. 89-8] at 27.)

Gruenewald, Benner, and the school's Assistant Principal, Jamal Abdur-Salaam, met about this issue the next week. (*See* Benner Dep. at 52-53; Abdur-Salaam Dep. at 25-26.) During this meeting, Gruenewald alleges that Benner admitted that, not only did he inform the girl's mother of the incident itself, but he revealed the name of the male assailant, too. (*See* Defs.' Ex. 39 [Doc. No. 78-1] ("Benner First Investigation File") at 11 (Gruenewald meeting notes); *accord* Gruenewald Dep. at 45.) This distinction matters because, although the former allegation would not be a violation of SPPS's student privacy policy, the latter allegation *would* constitute a violation. (*See* Gruenewald Dep. at 47-53; Yang Dep. at 15-18.) Benner has strongly and consistently denied that he ever made the latter comment to Gruenewald or to anyone in JAJ Elementary. (*See, e.g.*, Benner Dep. at 56.)

After this meeting, Gruenewald reached out to HR (and possibly Collins) about disciplining Benner, on grounds that Benner (allegedly) violated SPPS's student privacy policy. (*See* Gruenewald Dep. at 47-48; *see also* Collins Dep. at 50-51 (stating that he remembers Gruenewald discussing this event with him at the time, but that he "would not have been part of the investigation at all").)[8] HR investigator Amylee Yang, in turn, decided to initiate an official investigation. (*See* Yang Dep. at 15-18.) Although Benner denied sharing the name of the assailant with the girl's mother during his interview with Yang and

---

[8]     Gruenewald was also suspicious of Benner's account because, during that initial meeting, Benner first said that the mother called him, before then admitting that he called the mother. (*See* Gruenewald Dep. at 55; Abdur-Salaam Dep. at 25-26.) Benner concedes that he misspoke on this issue. (*See* Benner Dep. at 52-53.)

Gruenewald on October 8, and Yang did not speak to the girl's mother at any point during her investigation, Yang nonetheless marked Gruenewald's allegations against Benner "substantiated" (as opposed to "unable to be substantiated"), and found that Benner had, in fact, violated SPPS's student privacy policy. (*See generally* Benner First Investigation File.) In so finding, Yang relied entirely on Gruenewald's recollection of the initial meeting. (*See* Yang Dep. at 21, 30 (testifying that she relied on Gruenewald's recollection because "it's not [HR's] practice to reach out to parents" during investigations).)[9]

As a consequence, on October 20, 2014, HR (with Gruenewald's approval) sent Benner a "Letter of Directive" ("LOD"). (*See* Benner First Investigation File at 2; *accord* Gruenewald Dep. at 58.) This letter marked the first official discipline Benner had received in his 19-year teaching career. The LOD directed Benner to "not disclose any private, confidential, or non-public data to others if a compelling professional purpose is not being served or [is] not required by law," and further stated that "[f]ailure to follow these expectations will be considered insubordination and could result in disciplinary action, including, written reprimand, suspension without pay, or discharge." (*See* Benner First Investigation File at 2.)[10]

---

[9] Notably, during a subsequent deposition, the girl's mother testified under oath that, when Benner called her, "he did not mention any names, nothing." (Mother Dep. [Doc. No. 90] at 30.) The mother further testified that Benner was "just being a concerned teacher," which she "appreciated." (*Id*. at 31.)

[10] It also bears mentioning that, although neither Collins (Assistant Superintendent) nor Silva (Superintendent) was directly involved in this investigation, Benner was on both individuals' radar at the time of this incident. Specifically, on October 3, 2014, Benner forwarded Silva an e-mail he had sent to Gruenewald discussing various behavior problems at JAJ Elementary. (*See* Pl.'s Ex. 127 [Doc. No. 89-94] at 2 ("Oct. 3, 2014 E-

### 3. *Benner Is Investigated and Disciplined, Again, In November 2014, This Time for Allegedly "Singling Out" a "Bully" in Front of His Fourth-Grade Class*

In mid-October 2014, shortly after receiving the LOD, a parent of one of Benner's students told Benner that her son was being bullied at school, and that the (unknown) "bully" was breaking her son's glasses. (*See* Benner Dep. at 58.) Subsequently, on Friday October 24, 2014, Benner "gather[ed] his class around" to "talk[] to them about if you know of anybody getting bullied let me know, don't be afraid to tell me." (*Id.* at 58-59.) In the midst of this discussion, one of Benner's students voluntarily identified "the bully" by name, and said "she's breaking [the victim student's] glasses." (*Id.* at 59.) According to Benner and his teaching assistant ("TA"), Sean Kelly, who was also in the room, Benner stopped the student from going any further in front of the class, and instead took the student outside to discuss the incident one-on-one. (*Id.*) Benner later reported the "bully" to Gruenewald. (*Id.*) Shortly thereafter, the "bully" began behaving aggressively toward the student that "outed" her in class, calling her "fatso" and "tattle-tale," and threatening to "beat her up" "during recess." (*See* Defs.' Ex. 41 [Doc. No. 78-1] ("Benner Second Investigation File") at 2.)

Although Gruenewald does not remember why she contacted HR about this incident, a week or so later she and Yang again decided to initiate an official investigation against

---

mail Correspondence").) Silva and Collins then discussed this e-mail internally, and Collins advised Silva to "not answer" because there had "been a development" with Benner (presumably, the initiation of the HR investigation). (*Id.*) Silva and Collins (along with the other Assistant Superintendents) then appeared to discuss Benner at an October 8, 2014 staff meeting, before HR issued the LOD. (*See* Pl.'s Ex. 129 [Doc. No. 89-96] ("Oct. 9, 2014 Meeting Agenda") (listing "Teacher Benner" as an agenda item); *see also* Silva Dep. at 109-110 (suggesting that this agenda item may have reflected internal discussions about moving Benner to a different school).)

Benner. (*See* Gruenewald Dep. at 68-71; *see also* Benner Dep. at 59 ("The next thing, you know, there's an investigation, just out of the clear blue there's an investigation. I was shocked.").) Based on the investigation documents, it appears that Gruenewald believed Benner "singled out" the bully in class, and thus violated school rules by "escalating" the threat of bullying. (*See* Benner Second Investigation File at 1.) Yang and Gruenewald conducted interviews with a few of Benner's students, and determined that Benner might have specifically asked his students to tell him who broke the victim-student's glasses, rather than spoken in general terms, as he claimed he did. (*See id.* at 12-14.) However, because both Benner and Kelly testified that Benner did not "single out" the bully in any way whatsoever (*see id.* at 6-11), Yang marked Gruenewald's allegations against Benner as "unable to be substantiated." (*Id.* at 1; *accord* Yang Dep. at 46-48.)

Despite this finding, however, Yang determined that, by merely discussing bullying in front of the class, Benner violated the October 20 LOD against sharing "confidential student information." (*See* Benner Second Investigation File at 2.) Consequently, on December 2, 2014, HR (with Gruenewald's approval) issued Benner a "written oral reprimand" as punishment. (*Id.*) The reprimand stated that Benner's actions "put[] [his] students at risk of serious harm," were "completely unacceptable and unbecoming a teacher in [SPPS]," and would "not be tolerated." (*Id.*) "If there are further problems," the reprimand concluded, "more serious disciplinary action may be taken, including possible suspension without pay or discharge." (*Id.* at 3.) Moreover, unlike the LOD, Assistant Superintendent Collins was "carbon-copied" ("cc'ed") on this reprimand. (*Id.*; *see also* Collins Dep. at 63-64 (admitting

that he saw this reprimand, but again stating that he did not "review" the investigation and was "not involved").)[11]

### 4. In December 2014, SPPS Asks Benner to Transfer to a Different Elementary School; Benner Declines

On December 15, 2014, Ryan Clukey, an HR team member, sent an e-mail to Collins and Gruenewald, among others, stating, "Aaron Benner . . . has expressed displeasure in his current role," and that HR "did not see any contract language prohibiting [SPPS] from administratively transferring him" to a recently-vacated fifth grade teaching position at a different SPPS elementary school, called EXPO Elementary. (*See* Defs.' Ex. 43 [Doc. No. 78-1] ("SPPS Benner Transfer Correspondence") at 9.) Four minutes later, Collins responded, "I approve," and stated, "we need to move on this ASAP." (*Id.* at 8.) Collins also added Silva to the e-mail chain. (*Id.*) About an hour later, Silva e-mailed Collins, "HR should guide you." (Pl.'s Ex. 130 [Doc. No. 89-97] at 3.)

The genesis of this "transfer plan" is murky. At his deposition, Clukey testified that, although this was the only teacher transfer he was involved in while working at SPPS, he had "no idea" how the plan came about, or who told him about Benner's "displeasure in his current role." (Clukey Dep. at 28-30.) For her part, Silva suggested that this idea arose

---

[11]     Notably, Benner has submitted evidence that a *white* first grade teacher at JAJ Elementary named Amanda Baldridge "shamed a student" who wasn't following directions "in front of the entire class," and was not similarly reprimanded. (Schwartz Dec. [Doc. No. 89-14] ¶ 2.) Specifically, Baldridge's TA (Dawn Schwartz) attests, Baldridge asked her class to "raise their hand" if they wanted the misbehaving student to leave the classroom, and then "raised her own hand." (*Id.*) Although Schwartz reported this incident to Gruenewald because she found Baldridge's actions "appalling," Baldridge was neither investigated nor reprimanded. (*See id.* ¶¶ 3-6; *accord* 2014-2016 JAJ Teacher Discipline Statistics at 3.)

organically when meeting with her Assistant Superintendents, including Collins. (*See* Silva Dep. at 110-12.) Collins, however, testified that the transfer was not his idea, and that he "didn't remember who specifically brought up [Benner's] name" in relation to a transfer. (Collins Dep. at 67.) Gruenewald also disclaimed either requesting that Benner be transferred, or even telling anyone in SPPS's administration that Benner "wasn't happy" in his current role. (*See* Gruenewald Dep. at 78-79.) And, adding to the uncertainty, Melissa Lehmann – the then-principal at EXPO Elementary – testified that she understood the transfer to be an attempt to place Benner under her supervision (because she had supervised him in the past), on the implicit condition that she would "control [Benner] to behave." (Lehmann Dep. [Doc. No. 89-4] at 9, 13; *see also* Dec. 15, 2014 Clukey E-mail to Collins et al ("In addition, we feel that Melissa Lehmann's previous supervision of Benner will be a key factor in making this a successful transition.").)

In any event, later that day, Assistant Principal Abdur-Salaam pulled Benner out of his class "in the middle of a lesson" and informed Benner that Ryan Clukey from HR needed to see him. (Benner Dep. at 130.) Clukey told Benner about the "great offer" to move to EXPO Elementary, and gave him 48 hours (later shortened to 24 hours) to decide if he wanted to transfer. (*Id.* at 130-31.) Although Benner considered accepting the offer because he respected Principal Lehmann (based on his prior work with her), he quickly decided that he could not "betray [his] 24 beautiful kids" by leaving them in the middle of the school year. (*Id.* at 137.) This was especially so, Benner thought, because EXPO Elementary was in an "affluent area" of St. Paul, and his departure would accordingly give the impression that "this black teacher [was] abandoning these black kids to go work with

some white kids." (*Id.* at 132-33.) Benner also declined because he suspected that SPPS was "attempting to silence [him]" by "mov[ing] [him] to a different school." (*Id.* at 136.)

Jim Vollmer, SPPS's head of HR, reported Benner's decision to the other SPPS administrators on the afternoon of December 16, 2014. (*See* SPPS Benner Transfer Correspondence at 3.) Shortly thereafter, another HR employee, Laurin Cathey, responded, "I believe [Superintendent Silva] will still want to move [Benner] on the basis that it is best for the District," and added that "once [Silva] confirms we need to be ready to execute on this tomorrow." (*Id.* at 4.) However, after some internal discussion over potential litigation risk between the union and SPPS over this kind of forced mid-year transfer, SPPS decided to not transfer Benner to EXPO Elementary. (*Id.*; *but cf.* Silva Dep. at 113 (contending that she did not demand Benner's transfer because she does not "believe in transferring teachers who don't want to be transferred").)

5. ***At the Start of the Second Semester, Benner Is Investigated a Third Time, Allegedly for Taking a "Suspicious" Sick Day***

In early January 2015, Benner took a sick day on a day that he was supposed to meet with Gruenewald to discuss a student behavioral incident, and accidently neglected to inform Gruenewald of his absence. (*See* Benner Dep. at 280-89.) Because of this missed meeting, and because Benner had taken more sick days by this point in the year than most of his colleagues (albeit not more than he was contractually entitled to),[12] Gruenewald called Collins

---

[12]     Specifically, JAJ Elementary attendance records show that Benner took nine sick days in the fall of 2014. (*See* 2014-15 JAJ Elementary Attendance Records at 2.) Although this number is slightly more than most of Benner's colleagues, one of Benner's colleagues also took nine sick days during that time period, and two of Benner's colleagues took over 20 sick days each during that time period. (*Id.*)

and discussed whether she should contact HR to open a (third) investigation. (*See* Collins Dep. at 23-24.) Collins encouraged Gruenewald to contact HR. (*Id*. at 24.) Shortly thereafter, Yang opened another official investigation into Benner. (*See* Yang Dep. at 57.) During the investigatory interview, Benner provided a doctor's note justifying the at-issue sick day and apologized for the confusion over the missed meeting. (*See generally* Defs.' Ex. 45 [Doc. No. 78-1] ("Third Benner Investigation File"); *see also* Pl.'s Ex. 48 [Doc. No. 89-46] ("Jan. 8, 2015 Benner Doctor Note").)

Because he complied with HR and Gruenewald's requests, Benner did not face any formal discipline as a result of this investigation. Still, Benner found this investigation "harassing . . . to the 'nth' degree" because "everybody [was] talking about me in school, 'Benner is a veteran teacher, he's tenured, he's got to bring doctors' notes like a little kid, ha-ha.'" (Benner Dep. at 289.) Indeed, evidence in the record suggests that this kind of investigation was unusual. (*See, e.g.*, Collins Dep. at 24-25 (stating that he "could not recall" other investigations into "teacher absenteeism" during the "2014-2015 school year," at any school in SPPS); Gruenewald Dep. at 84 ("Q: Were there any other teachers that you required doctors' notes of that year? A: I don't – I don't think so.").)[13]

6. ***At the Same Time Benner Reaches Out to Assistant Superintendent Collins to Discuss This "Retaliation," Benner Is Investigated and Disciplined, Again, This Time for Accidently Leaving His Class Unsupervised for a Few Minutes***

---

[13] Again, and notably, in "winter 2014-2015," HR expressly declined to initiate an investigation against a *white* tenured teacher whose "fellow teachers complained about" the teacher's "frequent absenteeism." (2012-2016 JAJ Teacher Discipline Statistics at 2.) Instead, the Principal had a "coaching conversation" with the teacher. (*Id.*)

After this third investigation, Benner began to seriously believe that SPPS was "retaliating" against him for his May 20 speech. (*See generally* Benner Dep. at 74-91.) Benner, in turn, decided to reach out to Collins to express his frustration. (*Id.*) Benner thought this step necessary because he had heard that Collins had an "MO" of "papering" disliked teacher files with disciplinary measures, so that the District could "fire [that teacher] eventually," which Benner did not want to happen. (*Id.* at 74.) Indeed, Benner recalls, Collins was "well-known throughout the [teachers'] union for getting rid of teachers easily." (*Id.* at 87.) Moreover, although Benner suspected that Silva might be involved in this "retaliation" as well, Collins seemed like the better person to contact because Silva had not responded to Benner's text messages informing her of the investigations (which Benner had sent because of Silva's earlier request to "contact her first . . . if [Benner] had any problems whatsoever"). (*See id.* at 67-74 (describing the "maybe five" text messages he sent to Silva, and the voicemail he left for one of Silva's aides); *accord* Silva Dep at 35-36 (acknowledging that she received text messages from Benner, and that she did not respond to any of them).)[14]

As such, on January 25, 2015, Benner e-mailed Collins, with Silva cc'ed. (*See* Defs.' Ex. 46 [Doc. No. 78-1] ("January-February 2015 Benner-Collins E-mail Correspondence")

---

[14] One of the other teachers involved in the "High Expectations Policy," a man named Roy Magnuson, also put Silva on notice of Benner's situation. Specifically, on November 19, 2014, Magnuson texted Silva that Benner was "discouraged" and "frustrated" over "several specific issues and events" and the "response from his admin and the district hierarchy." (Pl.'s Ex. 148 [Doc. No. 89-106] ("Nov. 19, 2015 Magnuson-Silva Text Exchange").) Magnuson further noted that Benner's "discouragement and frustration" created "the potential" "for something to boil over into yet another negative, and quite public, black eye for SPPS." (*Id.*) Silva acknowledged this message with the word, "ok." (*Id.*)

at 4.) Benner began his message by noting the "three investigations" and "transfer request," before then stating: "It's quite obvious that these investigations and the transfer request were meant to send some sort of message or maybe intimidate me. My opposition to the district's Racial/Equity policies are well known. However, these frivolous investigations will not hinder my efforts." (*Id*.) Benner also stated that the investigations were taking away from his teaching time, and that "my principal [Gruenewald] needs to be focused on the needs of the students at [JAJ Elementary], instead of conducting investigations and sitting in on interviews that involve me." (*Id*.) Benner concluded by asserting, "I'm sure there will be more investigations, but I will continue to devote my time and energy to my students." (*Id*.)

Collins responded the next day. Collins began his message by attempting to reassure Benner: "If what you are insinuating is that there is some type of conspiracy against you because of your opposition to the District's racial equity policy, I want to assure you there is not." (*Id*. at 2-3.) Collins then suggested that the two of them "have a conversation," so that Collins could both "share some perspective and better understand [Benner's] concerns." (*Id*. at 3.)

Benner, in turn, said, "it'd be great to meet and discuss my investigations and my vision for [JAJ Elementary]." (*Id* at 2.) The two men then agreed to meet at JAJ Elementary on Thursday February 5, 2015. (*Id*. at 1-2.)

However, on February 3, 2015, Benner learned that he was going to be investigated (a fourth time) for an incident that occurred on January 30, 2015. Because of this development,

Benner cancelled the meeting with Collins, and said he would "be in contact after investigation #4 has concluded." (*Id*. at 1, 6.)[15]

This investigation arose because Benner unintentionally left his classroom unsupervised for a few minutes during a Friday "indoor recess," which Gruenewald and an aide noticed because they were conducting "walk-throughs" of fourth grade classrooms that day. (*See generally* Defs.' Ex. 47 [Doc. No. 78-1] ("Fourth Benner Investigation File").) Although Benner thought his TA, Sean Kelly, was in the room when Gruenewald arrived, Kelly was not. (*See id*. at 4-7, 17-18.) Rather, Gruenewald and her aide arrived around 12:20 P.M., followed two minutes later by Kelly, and then Benner approximately three minutes after that (Benner had been walking a "behavior referral slip" down to the main office). (*See id*. at 8-9.) Once Benner returned, he apologized and began teaching the planned lesson. (*Id*.) Benner later sent Gruenewald an apologetic text message, admitting that "this [was] my fault" and promising that "this will never happen" again; Kelly sent a similarly apologetic e-mail, and verified Benner's innocuous version of events. (*Id*. at 17-18.) Although there is no allegation that the children attempted to hurt each other while left unsupervised – Gruenewald's aide said that, when she and Gruenewald entered the room, "the students were seated at their tables and working quietly on their iPads [which had been provided by SPPS in a recently-launched initiative]" – Gruenewald did notice that a few students were looking at non-school-related websites, such as "Justin Bieber [music] videos." (*Id*. at 8-9)

---

[15]     It does not appear that Benner contacted Collins to arrange a meeting at any later point in the school year.

As with the prior "sick day" investigation, Gruenewald appeared to confer with Collins before deciding to contact HR. (*See* Collins Dep. at 30-31.)[16] Nonetheless, Collins again recommended that Gruenewald "reach out to HR," which again resulted in an official HR investigation. (*Id.* (recalling that Gruenewald "explained the incident to me and then I basically [said] 'reach out to HR'").) After holding another investigatory interview – this time with both Yang and Clukey from HR – Gruenewald and the HR team decided that Benner's "misconduct" warranted an even sterner "written reprimand." (*See* Fourth Benner Investigation File at 4-7.)

Consequently, on February 19, 2015, Benner received a letter informing him that he had "violated previous directives," *i.e.*, the October 20 LOD and the December 2 "written oral reprimand," by leaving his class unsupervised for a few minutes, and hence endangering "student health and safety." (*Id.* at 2.) The reprimand further stated that Benner's behavior was "unacceptable and unbecoming of a teacher in [SPPS]," and "would not be tolerated." (*Id.*) The reprimand also informed Benner that "effective immediately," he could not "make administrative decisions regarding students' daily routine, such as cancelling/extending recess," "leave his class unattended," or "utilize [anyone other than his TA] to complete clerical errands . . . during class time." (*Id.*) As with the December 2 reprimand, this reprimand

---

[16]     Notably, if Collins's recollection is accurate, he would have seen Benner's January 25 e-mail by the time Gruenewald called him to discuss this issue (because he responded to Benner's e-mail on January 26, whereas the classroom incident occurred on January 30).

concluded with the admonishment that "if there are further problems, more serious disciplinary action may be taken, up to and including discharge." (*Id.*)[17]

### 7. *Gruenewald Fires Benner's TA, Sean Kelly*

A few weeks later, in early March 2015, Benner learned that Kelly, his TA, had been fired. (*See* Benner Dep. at 115-19.) Kelly was a "hard worker," in Benner's view, and his termination "came out of nowhere." (*Id.* at 116.) Although there was no direct evidence linking Kelly's termination to Kelly's support of Benner during two of the at-issue investigations, Benner believed that the occurrences may have been connected. (*See id.* at 118 ("I think Ms. Gruenewald was retaliating against me because Mr. Kelly was always a witness in my classroom and corroborated my stories.").) For her part, Gruenewald claims that she terminated Kelly's employment (after discussions with HR) because he was "repeatedly not on his [TA] schedule." (Gruenewald Dep. at 78.) In either event, after Kelly's termination, Benner did not receive another TA. (*See* Benner Dep. at 118.)

### 8. *After Benner Reaches Out to the Press in March 2015 to Discuss His Experience, Benner Is Not Officially Investigated Again; However, Benner Does Face Other Alleged Hardships During the Final Months of the School Year*

Shortly after the Kelly incident, Benner decided to "go public" with his story. As such, on March 30, 2015, the Minneapolis periodical *City Pages* published an article entitled, "St. Paul Teacher Aaron Benner Claims Retaliation for Complaining About Discipline." (*See*

---

[17]     Again, in contrast to Defendants' treatment of Benner, teacher disciplinary records show that, in spring 2014, when JAJ Elementary's then-principal observed a *white* tenured teacher engaging in arguably worse "classroom management," in that the teacher was failing to "de-escalate conflicts with and amongst students," HR did not open an investigation. (2012-2016 JAJ Teacher Discipline Statistics at 1.) Instead, SPPS provided the teacher "assistance from [an] admin intern." (*Id.*)

Defs.' Ex. 10 [Doc. No. 78-1] ("March 30, 2015 City Pages Article").) The article featured comments from Gruenewald, Silva, and Kelly, in addition to Benner, and suggested that Benner was facing retaliation for his advocacy, and that Kelly's termination may have been connected to his support for Benner. (*See id*. at 8 ("[Kelly] believes the district fired him in retaliation for backing Benner in his various investigations. . . Kelly says it felt like Gruenewald wanted him to throw Benner under the bus.").) In this article, Silva also commented that SPPS was not "retaliating against Benner," because "retaliation would be losing a job, cutting a salary, placing a teacher on leave." (*Id*. at 7-8.)

As Benner acknowledged in a June 2015 e-mail to Collins, SPPS did not initiate a "single investigation [into him] after the *City Pages* article" came out. (*See* Pl.'s Ex. 144 [Doc. No. 89-105] ("June 18, 2015 Benner E-mail to Collins").) However, certain "second semester" events nonetheless led Benner to believe that he was still being retaliated against, and that he was accordingly at risk of losing his job, even after the sympathetic press coverage.

*First*, sometime in April 2015, Roy Magnuson, *see supra* n.14, told Benner that Collins and Collins' wife had invited Magnuson over for dinner, and that Collins' wife "asked [Magnuson] . . . if [he] could get Benner to stop his public opposition to the District's implementation of racial equity." (Magnuson Dec. [Doc. No. 89-11] ¶ 5; *accord* Benner Dep. at 83-84.)[18]

---

[18] Similarly, discovery revealed that, as of early April 2015, Silva and Hardy still had the "group of five teachers" on the mind, too. Specifically, Ian Keith (one of the five teachers) e-mailed Hardy with the request that he contribute to an upcoming fundraiser aimed at aiding children in juvenile detention. (*See* Defs.' Ex. 30 [Doc. No. 78-1] ("April 2, 2015 Silva-Hardy E-mail Exchange").) Hardy forwarded the request to Silva, and added,

*Second*, at least twice during the second semester, Gruenewald placed "disruptive" students in Benner's classroom "with no note, no explanation, nothing." (Benner Dep. at 295-96.) Benner testified that, in his "[19] years of teaching," no principal had sent students to his classroom in this manner. (*Id.*) When Benner e-mailed Gruenewald about this issue, however, she did not respond. (*See* Pl.'s Ex. 42 [Doc. No. 89-43] ("Mar. 19, 2015 Benner E-mail to Gruenewald"); *cf.* Gruenewald Dep. at 119 ("Q: Did you put students with disciplinary or behavioral problems in Benner's class? A: At times, just like many other teachers had as well.").)

*Third*, in late April 2015, after it was alleged that a female student assaulted Benner, Gruenewald and Abdur-Salaam allegedly questioned Benner's students in gym class, without informing Benner beforehand, to see if Benner "hit [the student] first." (*See* Benner Dep. at 91-92, 350-51.) The gym teacher, as well as Benner's students, informed him of this "investigation." (*Id.*) Benner immediately asked Gruenewald and Abdur-Salaam to include him in the process, but he received no response. (*Id.* at 352; *but cf.* Gruenewald Dep. at 131-36 (claiming that she and Abdur-Salaam only asked the students questions about this incident because "there was an allegation from a parent that Benner had possibly provoked the child").) There is no indication in the record that Benner, in fact, acted wrongfully toward the student.

---

"It's rather bold of someone who isn't supporting my re-election to make this ask of me." (*Id.* at 1.) Silva, in turn, wrote, "really he is one of the enemies." (*Id.*)

At her deposition, Silva admitted that the word "enemies" referred to "people who were opposed to the racial equity/PEG," including Benner. (Silva Dep. at 122-24.) Silva regretted using the word. (*Id.*)

*Finally*, as a general matter, testimony from two of Benner's colleagues verified that, throughout the 2014-2015 school year, Benner felt a great deal of stress because of the District's actions. (*See* Ritten Dep. at 16 ("I believe that, during that time . . [Benner] was . . . feeling some anxiety and stress about being at school . . . [because] he thought he was going to be investigated or was being investigated"); Rapp Dep. at 48-49 (testifying that Benner's "stress levels" "increased greatly" over the second half of the school year, and that Benner found it "alarming" "that he kept receiving these letters," because "he had been teaching for so many years [without] receiving any, and we didn't know of any other teachers that were receiving them").)

### C. Benner's Departure from SPPS

At the conclusion of the 2014-2015 school year, in "mid-May 2015," Benner accepted a job at the Community of Peace charter school, where he had taught earlier in his career; Community of Peace had been soliciting Benner for months. (Benner Dep. at 109, 146.) Benner took the Community of Peace job because he was worried that, due to the "insubordination" and "conduct unbecoming a teacher" language in his reprimand letters, he could be fired "for cause" "at any time," and that "tenure was not protecting [him] at all." (*Id*. at 89-90; *see also id*. at 95-96 (noting that he gleaned this understanding of the termination process from his union representative).) Moreover, Benner thought, "if [he] did get fired," he would "have [a] stigma," or "scarlet letter," that would prevent him from receiving a good teaching job again. (*Id*. at 90, 354.) Although the record is not clear on this point, it appears that Community of Peace paid Benner the same amount as his final year in SPPS, but that they offered less generous health care and retirement benefits (not to mention

no union or tenure). (*See id.* at 317-18, 337-38, 355.) According to Benner, though, this did not matter because SPPS "beat [him] up," and "took [his] spirit," such that "money wasn't the key for [him]." (*Id.* at 159.) "It was all about saving my teaching career and having options," Benner added. (*Id.*)

That said, after Benner accepted the Community of Peace position, but before he officially resigned from SPPS, Benner did not rule out transferring to a different SPPS school for the 2015-2016 school year. (*See* Benner Dep. at 109-10; *see also* Defs.' Ex. 54-56 [Doc. No. 78-1] ("Benner SPPS Transfer Documents").) Indeed, Benner seriously considered this option for almost the entire summer of 2015, to the point of telling both his union representative and his Community of Peace liaison at varying points during the summer that he was going to stay in the District. (*See* Benner Dep. at 109-11, 151-53.) But, after learning that his "investigations [were] going to follow [him]" to his new school, such that he would still be at risk of losing his job were another investigation initiated, Benner decided that he had "no choice" but to leave SPPS for good. (*Id.* at 110; *accord* Rapp Dep. at 74-76 (confirming Benner's reasons for leaving SPPS).) Consequently, on August 4, 2015, Benner resigned from SPPS, citing "harassment from Andrew Collins" as the reason for his resignation. (*See* Defs.' Ex. 58 [Doc. No. 78-1] ("Benner Resignation Form").)[19]

---

[19]     The Court makes two additional points about the likelihood of SPPS terminating Benner. First, as Defendants correctly note, because Benner's union representative "grieved" the December 2, 2014 "written oral reprimand," SPPS agreed to "hold [that] discipline in abeyance," and eventually remove it from Benner's record, so long as Benner talked to a workplace discipline counselor and engaged in "no further violations of the same or similar nature" until summer 2016. (See Defs.' Ex. 50 ("March 19, 2015 Grievance Settlement").) But, if Benner failed to do so, "the reprimand would become part of his permanent record and he would serve any other discipline provided to him by

Benner's departure from SPPS in the summer of 2015 did not escape the notice of SPPS administrators. For instance, on June 1, 2015, after Benner had made another media appearance discussing his experience in SPPS (this time on Fox News), Michelle Bierman (SPPS's Director of Racial Equity) e-mailed Silva a link to the news story, and added, "[Community of Peace] announced . . . that [Benner] is coming." (Pl.'s Ex. 139 [Doc. No. 89-102] ("June 1, 2015 Silva – Bierman E-mail Correspondence").) Silva replied: "Kicking to the end." (*Id.*) To which Bierman responded, "And probably after as well." (*Id.*)

### D. This Litigation's Procedural History

On August 12, 2015, days after resigning from SPPS, Benner filed a "charge" with the Minneapolis branch of the Equal Employment Opportunity Commission ("EEOC"), accusing the District of racial discrimination and retaliation. (*See* Pl.'s Ex. 106 [Doc. No. 89-78] ("Mar. 31, 2017 EEOC Decision") at 6; *see also Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir. 2006) (noting that, "before bringing [a discrimination] suit in federal court," "a plaintiff must

---

[SPPS]." (*Id.*) This settlement did not discuss the more serious February 19, 2015 "written reprimand," nor any of the other investigations in Benner's record. Moreover, as Benner noted at his deposition, this settlement provided him cold comfort because "if [he] had one [more] investigation," he believed SPPS "could fire [him]." (Benner Dep. at 110.)

Second, SPPS's head of HR, Jim Vollmer, attested that SPPS "rarely terminates the employment of a tenured teacher," and that "nothing done by Benner, either individually or collectively, was even close to being so extreme as to have warranted the District to terminate Benner's employment." (Vollmer Dec. ¶¶ 4, 8.) However, there is no dispute that the language contained in Benner's reprimand letters could constitute "cause" to dismiss a tenured teacher under Minnesota law. (*See supra* at 20.) Moreover, facts in the record demonstrate that, from his perspective, Benner genuinely believed that he could be fired as a result of the disciplinary actions SPPS took against him during the 2014-2015 school year, and that nobody from SPPS or his union told him otherwise at the time.

first timely file an 'administrative charge' with the EEOC") (citing 42 U.S.C. § 2000e-5(e)).)

On March 31, 2017, following a thorough investigation, the EEOC determined that Benner had established "probable cause for discrimination based on race and retaliation." (Mar. 31, 2017 EEOC Decision at 12.)

A few months later, on May 11, 2017, Benner filed a complaint against SPPS in this Court. (*See* Compl. [Doc. No. 1].) Benner's initial complaint listed three claims: Title VII race discrimination; Title VII retaliation; and Title VII hostile and abusive work environment. (*Id*.) Benner subsequently amended his complaint to include a fourth claim for "Title VII constructive discharge." (*See* First Am. Compl. [Doc. No. 12].) SPPS promptly moved to dismiss Benner's complaint. (*See* SPPS Mot. to Dismiss [Doc. No. 5].)

On October 4, 2017, after entertaining oral argument, the Court denied most of SPPS's motion to dismiss from the bench, citing the need to develop a factual record. (*See* Oct. 4, 2017 Minute Entry [Doc. No. 18]; Oct. 4, 2017 Hr'g Tr. [Doc. No. 68].) Two months later, on December 4, 2017, the Court issued a written order further explaining its decision. *See Benner v. St. Paul Pub. Schs.*, 2017 WL 6001736 (D. Minn. Dec. 4, 2017); *see also* Doc. No. 27. In its Order, the Court first construed Benner's "Title VII constructive discharge" claim as simply "part of [Benner's] race discrimination and retaliation claims," and then proceeded to explain why the facts alleged in Benner's Complaint plausibly set forth claims of both "Title VII race discrimination," and "Title VII retaliation." *Id*. at *5-8, n.3. Notably, with respect to the "constructive discharge" allegations at issue in those two claims, the Court found that Benner had "adequately pled that SPPS created intolerable working conditions that forced him to resign because the risk of staying and losing tenure and benefits if he was fired

was simply too great." *Id.* at *6. However, the Court dismissed Benner's "Title VII hostile and abusive work environment claim," which it viewed as distinct from the "constructive discharge" allegations, on grounds that Benner failed to "plausibly alleg[e] that SPPS's actions were 'severe or pervasive enough to create an objectively hostile or abusive work environment.'" *Id.* at *8 (quoting *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 801 (8th Cir. 2009)).

On January 31, 2018, Benner filed a second amended complaint, this time against SPPS *and* Gruenewald. (*See* Second Am. Compl. [Doc. No. 37].) This complaint contained the four remaining at-issue claims: (1) Title VII race discrimination against SPPS, (2) Title VII retaliation against SPPS, (3) Minnesota Whistleblower Act retaliation against SPPS, and (4) First Amendment retaliation against Gruenewald. (*Id.*) Shortly thereafter, Benner filed a third amended complaint that added a First Amendment retaliation claim against SPPS, too. (*See* Third Am. Compl. [Doc. No. 46]; *see also* Joint Stipulation to File Third Am. Compl. [Doc. No. 43] (explaining this minor change).) SPPS and Gruenewald filed an answer on February 14, 2018. (*See* Answer [Doc. No. 40].)

Following several months of discovery and depositions, SPPS and Gruenewald filed the present motion for summary judgment. Benner vigorously opposes the motion. The parties submitted full briefing on the matter, as well as several hundred pages of evidence, and the Court entertained oral argument on February 1, 2019. (See Defs.' Br. in Support of Summ. J. [Doc. No. 75] ("Defs.' Br."); Pl.'s Br. in Opp. to Summ. J. [Doc. No. 95] ("Pl.'s Opp. Br."); Defs.' Reply Br. [Doc. No. 100].)

## II.    DISCUSSION

A court may grant a party summary judgment if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A party opposing summary judgment "'must set forth specific facts showing that there is a genuine issue for trial,' and 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)). However, in considering a summary judgment motion, the Court must "view[] the evidence in the light most favorable to the nonmoving party," *Grinnell Mut. Reinsurance Co. v. Schwieger*, 685 F.3d 697 (8th Cir. 2012), and must not "weigh the evidence and determine the truth of the matter itself," *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012). "In essence," the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

In their motion for summary judgment, Defendants set forth the following four arguments. ***First***, and most prominently, Defendants contend that no reasonable juror could find that SPPS or Gruenewald "constructively discharged" Benner, or otherwise engaged in any "adverse employment action" against him, and that the Court must therefore grant Defendants summary judgment on all four of Benner's claims. (*See* Defs.' Br. at 19-28.) ***Second***, Defendants argue that Benner's Title VII retaliation claim must be dismissed because Benner did not oppose an "employment practice" that was illegal under Title VII itself. (*See id*. at 29-30.) ***Third***, Defendants assert that Benner's First Amendment retaliation claim must

be dismissed because of *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) (with respect to SPPS), and because of the doctrine of qualified immunity (with respect to Gruenewald). (*See id*. at 30-33.) ***Finally***, as a procedural matter, Defendants submit that the Court must strike Benner's claim for punitive damages because Benner failed to request permission to assert a claim for punitive damages under Minn. Stat. § 549.191. (*See id.* at 33-34.) Importantly, however, other than the first argument noted above, Defendants make no specific arguments with respect to either Benner's Title VII race discrimination claim or Benner's Minnesota Whistleblower Act retaliation claim.

The Court will first address Defendants' overarching argument about whether Benner was subject to an "adverse employment action," and will detail why the Court cannot resolve this question at summary judgment. The Court will then address the remaining elements of Benner's four claims, claim by claim, and will explain why Benner's Title VII race discrimination and Minnesota Whistleblower Act retaliation claims may proceed to a jury trial, while Benner's Title VII retaliation and First Amendment retaliation claims must be dismissed as a matter of law. The Court will conclude by noting why it will not strike Benner's claim for punitive damages.

## A. Adverse Employment Action / Constructive Discharge

### 1. The Law

The four at-issue claims share a common element: the requirement that a plaintiff-employee point to an "adverse employment action" the defendant-employer took against them. *See Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1107 (8th Cir. 2016) (Title VII race discrimination); *Chavez-Lavagnino v. Motivation Educ. Training, Inc.*, 767

F.3d 744, 749 (8th Cir. 2014) (Minnesota Whistleblower Act retaliation); *Ellis v. Houston*, 742 F.3d 307, 323 (8th Cir. 2014) (Title VII retaliation); *Shockency v. Ramsey Cty.*, 493 F.3d 941, 948 (8th Cir. 2007) (First Amendment retaliation). Admittedly, "adverse employment action" means something slightly different depending on the cause of action at issue. For instance, in the context of a Title VII race discrimination claim, or a First Amendment retaliation claim, an "adverse employment action" is "a tangible change in working conditions that produces a material employment disadvantage." *Bonenberger*, 810 F.3d at 1107; *accord Shockency*, 493 F.3d at 948. This can "includ[e] . . . termination, cuts in pay or benefits, and changes that affect an employee's future career prospects," *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013), as well as "lesser actions . . . if their cumulative effect causes an employee to suffer 'serious employment consequences' that adversely affect or undermine his position," *Shockency*, 493 F.3d at 948 (quoting *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997)).

By contrast, in the context of a Title VII retaliation claim, or a Minnesota Whistleblower Act retaliation claim, an "adverse employment action" need only be a "materially adverse" action "that would dissuade a reasonable worker from making or supporting a charge of discrimination [or a report of illegal conduct]." *Ellis*, 742 F.3d at 323; *accord Chavez-Lavagnino*, 767 F.3d at 749. Under this standard, even a "reprimand" can constitute an "adverse employment action," if that reprimand "threatens termination or any other employment-related harm," and, in context, exerts a "chilling effect" on a "reasonable worker's" likelihood of reporting wrongdoing. *Hill v. City of Pine Bluff, Ark.*, 696 F.3d 709,

715 (8th Cir. 2012); *see also Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 644 (8th Cir. 2009) (stressing the importance of "context" in reviewing retaliation claims).

That said, there is no dispute that, under any of the four at-issue claims, "constructive discharge" is an "adverse employment action." *See Thompson v. Bi-State Dev. Agency*, 463 F.3d 821, 825 (8th Cir. 2006) ("Just like any other discharge, a constructive discharge is an adverse employment action."). "To prove a constructive discharge, a plaintiff must show (1) a reasonable person in his situation would find the working conditions intolerable, and (2) the employer intended to force him to quit." *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007). As to the first element, "[t]he intolerability of working conditions is judged by an objective standard, not the employee's subjective feelings." *Tatom v. Georgia–Pacific Corp.*, 228 F.3d 926, 932 (8th Cir. 2000). As for the second element, "[e]vidence of the employer's intent can be proven 'through direct evidence or through evidence that the employer could have reasonably foreseen that the employee would quit as a result of its actions.'" *Sanders v. Lee Cty. Sch. Dist. No. 1*, 669 F.3d 888, 893 (8th Cir. 2012) (quoting *Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1083 (8th Cir. 2010)). "The employer can render working conditions intolerable through inaction as well as action." *Id.* A plaintiff must also show that they "gave [their] employer a reasonable opportunity to resolve [the] problem before quitting." *Id.*

### 2. Analysis

Here, a reasonable juror could find that Benner suffered an "adverse employment action." This is so for two reasons. ***First***, there are material disputes of fact as to whether the reprimands, investigations, and other hardships Benner faced constituted "adverse

employment action," under either of the two standards outlined above. *Second*, and independently, there are material disputes of fact as to whether Defendants "constructively discharged" Benner at the conclusion of the 2014-2015 school year.

*First*, with respect to (non-discharge-related) "adverse employment action," the facts detailed above, when viewed in the light most favorable to Benner, show that, in the course of just one school year, Defendants: **(1)** initiated official HR investigations against Benner *four times*, all for offenses that similarly situated teachers at his school had not been investigated for, and all in the context of an elementary school that had only initiated investigations into *five* tenured teacher incidents over the course of *four years*; **(2)** placed three written reports into Benner's file as a result of these investigations, all of which were based on disputed evidence (or arguably uncharitable interpretations of undisputed evidence), and none of which were based on misconduct remotely comparable in severity to the four other instances of tenured teacher discipline at JAJ Elementary between 2012 and 2016; **(3)** issued two written reprimands threatening "discharge" and containing language that could be used to terminate Benner "for cause," despite the fact that Benner was a well-respected 19-year teaching veteran with no prior disciplinary history; **(4)** issued one written reprimand that arguably affected Benner's independence as a teacher by, *inter alia*, barring him from making decisions concerning recess; **(4)** gave Benner 24 hours to accept an administrative transfer in the middle of the school year, which Benner had not requested, and which SPPS only appeared to back down from after considering the litigation risk of forcing Benner to transfer; **(5)** fired Benner's TA under (allegedly) suspicious circumstances and declined to give Benner a new TA; **(6)** placed unruly students in Benner's class without requesting Benner's

permission beforehand, which Benner had never experienced in his lengthy teaching career; and **(7)** questioned Benner's students about his conduct in an arguably suggestive (and potentially damaging) manner, without consulting Benner before or after.

As an initial matter, a reasonable juror could find that these actions constituted "adverse employment action" under the (more restrictive) Title VII race discrimination/First Amendment retaliation standard. For one, a reasonable juror could find that, by firing Benner's TA without replacement, placing unruly students in Benner's class, and issuing a reprimand explicitly curtailing Benner's teaching independence, Defendants' actions produced "a tangible change in working conditions that produce[d] a material employment disadvantage." *Bonenberger*, 810 F.3d at 1107; *cf. Jackman*, 728 F.3d at 805 (finding that allegedly "excessive" "performance log" and a "[large] number of [employee] coaching and counseling sessions" did *not* constitute "adverse employment action" because there was no evidence that employer made a "tangible change in [employee's] working conditions," "as a result of the longer personnel file").

More importantly, though, a reasonable juror could find that the "*cumulative effect*" of *all* of these actions caused Benner to suffer an "adverse employment action." *See, e.g.*, *Ellis*, 742 F.3d at 323-24 (holding that being "singled out for additional work details," when combined with having one's record "papered" "with reports for trivial or unsubstantiated allegations" that could be "use[d] in deciding whether to bring disciplinary proceedings," constituted "adverse employment action"); *Phillips v. Collings*, 256 F.3d 843, 849 (8th Cir. 2001) (finding that "uncharacteristically long and extraordinarily negative" performance evaluation that was "like no other received by [plaintiff] or any of his co-workers," when

46

combined with a "corrective action plan" and mandatory "remedial training," constituted "adverse employment action"); *Kim*, 123 F.3d at 1060-61 (finding that "reduction of duties, disciplinary actions, and negative personnel reports," constituted "adverse employment action," especially because there was evidence that defendant "did not handle "similar dispute[s]" involving employee discipline "in the same way").

Moreover, a reasonable juror could find that Benner suffered an "adverse employment action" under the (more lenient) Title VII retaliation/Minnesota Whistleblower Act retaliation standard. Most notably, because two of the written reprimands "threatened" "termination" and/or "employment-related harm" (by exposing Benner, a tenured teacher with no prior disciplinary record, to "for cause" termination), a reasonable juror could find that those reprimands, *on their own*, consisted "adverse employment action." This is so because, viewed in the context of a school system that appears to rarely (if ever) discipline tenured faculty for low-level violations, the reprimands would "have dissuaded a reasonable [tenured teacher] from" reporting wrongdoing. *Cf. Littleton*, 568 F.3d at 644 (finding that a "correction notice" threatening employee with termination "unless he stopped" engaging in "harassing actions" that he allegedly never took part in *could* constitute an adverse employment action under retaliation standard, if, "in context," the notice would "have dissuaded a reasonable worker from making a charge of discrimination").

**Second**, even if those actions could not constitute "adverse employment action" on their own, a reasonable jury could also find for Benner with respect to both elements of a "constructive discharge" claim. First, a reasonable juror could find that an objectively reasonable tenured teacher "in [Benner's] situation would [have found] the working

conditions [in SPPS] intolerable." *Carpenter*, 481 F.3d at 616. Specifically, a reasonable juror could find it "intolerable" for a respected, veteran teacher to continue working in a school district whose top administrators seemingly had a vendetta against them (based upon the *objectively* unusual investigations and disciplinary proceedings outlined above), all while facing a real risk of termination in the coming school year. *Cf. Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 790 (8th Cir. 2007) (holding that "*feelings* of being unfairly disciplined or criticized are insufficient to support a claim of constructive discharge") (emphasis added). It is true that "a threat of discharge" does not "*in and of itself* create conditions so intolerable that a reasonable person would resign." *Fischer v. Andersen Corp.*, 483 F.3d 553, 557 (8th Cir. 2007) (emphasis added). However, it is also true that it may be reasonable for an employee to resign and claim constructive discharge if they are "being apparently singled out and told [their] company [has] nothing for [them] to do and [they are] in danger of being discharged and losing retirement benefits." *Summit v. S-B Power Tool*, 121 F.3d 416, 421 (8th Cir. 1997) (favorably describing *Downey v. Southern Natural Gas Co.*, 649 F.2d 302, 305 (5th Cir. 1981)). Thus, because this case falls closer to the latter situation than the former, especially when considering the "totality of the circumstances," a reasonable jury could find for Benner on the first element of a constructive discharge claim. *See Gustafson v. Genesco, Inc.*, 320 F. Supp. 3d 1032, 1044 (N.D. Iowa 2018) (emphasizing the importance of "apply[ing] a totality of the circumstances analysis when determining whether an employee's conditions were intolerable").

Likewise, a reasonable juror could find that Defendants "intended to force [Benner] to quit." *Carpenter*, 481 F.3d at 616. Although the record does not reveal much in the way of

"direct" evidence of Defendants' intentions, a reasonable juror could infer from the messages exchanged between Silva and her colleagues, as well as from Defendants' general "inaction" in the face of Benner's (numerous) complaints, that Defendants intended to bring about Benner's resignation, or, at the least, knew that his resignation was a "reasonably foreseeable" result of their conduct. *See Sanders*, 669 F.3d at 893 ("The employer can render working conditions intolerable through inaction as well as action."). In *Sanders*, for instance, the Eighth Circuit found that a school board's "inaction in failing to respond to [an employee's] repeated requests for" information about the undesirable position she had been re-assigned to (allegedly as a part of a plan to get her to leave the school district), "support[ed] a claim of constructive discharge." *Id*. at 894.

Of course, it is true that an intra-company transfer offer can "undercut" a claim of constructive discharge, and that SPPS offered to transfer Benner to a school of his choice the summer before the 2015-2016 school year. *See, e.g.*, *Devin*, 491 F.3d at 790 (finding that an employer's offer to transfer plaintiff-employee "within the company," when coupled with an "express willingness to discuss [plaintiff's] work progress and different options," "undercut[] any claim of constructive discharge"). However, the Eighth Circuit confronted a similar argument in *Sanders*, and held that "merely offering a different job to an employee does not necessarily shield an employer from liability for constructive discharge," "*if* an employee quit because [they] reasonably believed there [was] no chance for fair treatment" from the employer. *Sanders*, 669 F.3d at 893 (emphasis added). Here, given the events of the 2014-2015 school year, and given the fact that the SPPS's top leadership appeared to be singling Benner out (rather than just the Principal at one school), a reasonable jury could find that

Benner "reasonably believed" that he had "no chance for fair treatment" within the District, transfer offer notwithstanding. *Id*.

Finally, a reasonable jury could find that Benner offered SPPS a "reasonable opportunity" to resolve his complaints prior to his resignation. *Id*. Specifically, the evidence detailed above showed that Benner texted Silva on multiple occasions, long before his resignation (as did one of Benner's colleagues, Roy Magnuson), and that Benner had an e-mail exchange with Collins that put Collins on notice of his disquiet. Although it remains for a jury to decide if Benner should have done more under the circumstances, this is a far cry from the cases cited by Defendants in support of granting summary judgment. *See, e.g.*, *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 826 (8th Cir. 2017) (plaintiff "never told anyone there was a problem in need of fixing" before he resigned); *Ames v. Nationwide Mut. Ins. Co.*, 760 F.3d 763, 769 (8th Cir. 2014) (plaintiff only "attempted to alert [her employer] to the problem . . . on the morning that [she] resigned," and then resigned without giving her employer a chance to resolve the problem).

Defendants offer several arguments in response to the above analysis, none of them availing.

**First**, Defendants cite various cases where the Eighth Circuit found that "investigations and written reprimands" did not constitute "adverse employment action" as a matter of law, and argue that the same conclusion should hold here. (*See* Defs.' Br. at 20-21.) Upon close inspection, however, the Court finds these cases factually distinguishable, either because the "investigations" did not result in tangible discipline like they did here, or because there was no evidence of a "cumulative effect" like that at issue here. *See, e.g.*, *Altonen v. City*

*of Minneapolis*, 487 F.3d 554, 560 (8th Cir. 2007) (holding that an "internal investigation" into plaintiff was not "adverse employment action" because the employer determined that the complaint against plaintiff was "without merit," and accordingly "took [no] disciplinary action against her for any reason related to the investigation"); *Jones v. Fitzgerald*, 285 F.3d 705, 714-15 (8th Cir. 2002) (finding that two "internal investigations" did not constitute "adverse employment action" because the plaintiff "admitted to committing the actions underlying both misconduct investigations," and, "during the investigations, [plaintiff] was not disciplined, nor was she threatened with discipline").

*Second*, and also with respect to "adverse employment action," Defendants contend that, because "the record is crystal clear that nothing SPPS did dissuaded Benner from speaking his mind" (*see* Defs.' Reply Br. at 4), no reasonable jury could find that Defendants actions "would [have] dissuade[d] *a reasonable worker* from making or supporting a charge of discrimination [or a report of illegal conduct]." *Ellis*, 742 F.3d at 323 (emphasis added). Indeed, Defendants point out, "Benner has never contended that he is unreasonable." (Defs.' Reply Br. at 5.) This argument misses the mark because the "reasonable worker" standard is an *objective* one, as the Supreme Court elucidated in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). The Supreme Court specifically chose this standard because it "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68-69. Likewise here, the Court will not attempt to determine whether Benner's "unusual subjective feelings" accorded with how a "reasonable teacher" would have responded under the circumstances. (*See, e.g.*, January-February 2015 Benner-Collins E-mail Correspondence at 4 (telling Andrew Collins, among

other things, "these frivolous investigations will not hinder my efforts").) Rather, as with all credibility determinations, a jury is best positioned to consider what weight, if any, to give Benner's defiance in the face of Defendants' actions against him.[20]

**Third**, turning to "constructive discharge," Defendants next argue that, because the Court dismissed Benner's "hostile work environment" claim on the pleadings (*see supra* at 39-40), the Court must "necessarily" dismiss Benner's "constructive discharge" claim at summary judgment. (*See* Defs.' Br. at 21-24.) In so arguing, Defendants primarily rely on the Supreme Court decision *Penn. State Police v. Suders*, in which the Court stated that, "hostile work environment is a 'lesser included component' of a constructive discharge claim," and therefore implied that the two claims must rise or fall together. (Defs.' Br. at 22 (quoting 542 U.S. 129, 133-34, 149 (2004)).) Now, it is true that courts in this District have cited *Suders* for the proposition that "the constructive-discharge standard is even more difficult to meet than the hostile-environment standard." *See, e.g.*, *Miller v. Bd. of Regents of Univ. of Minn.*, No. 15-cv-3740 (PJS/LIB), 2018 WL 659851, at *11 (D. Minn. Feb. 1, 2018). And it is also true that the Eighth Circuit often summarily rejects "constructive discharge" claims when the plaintiff has failed to prove their "hostile work environment" claim. *See, e.g.*, *O'Brien v. Dep't*

---

[20]  Although at least one circuit court has held that the *Burlington* standard forecloses *any* consideration of a plaintiff employee's "asserted imperviousness to acts of retaliation" in determining whether an employer's actions "would have dissuaded a reasonable worker" from reporting wrongdoing, *see Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008), the Eighth Circuit has implicitly suggested that an employee's subjective reaction may be a relevant consideration in the *Burlington* analysis, *see Hill*, 696 F.3d at 715; *accord Somoza v. Univ. of Denver*, 513 F.3d 1206, 1214 (10th Cir. 2008) ("[T]he fact that an employee continues to be undeterred in his or her pursuit of a remedy . . . *may* shed light as to whether the actions are sufficiently material and adverse to be actionable.") (emphasis added).

*of Agric.*, 532 F.3d 805, 811 (8th Cir. 2008) ("[Plaintiff] premises her constructive discharge claim on the same allegations we found insufficient to establish a hostile work environment. As such, her claim fails."); *accord Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1132 (8th Cir. 2014); *Helton v. Southland Racing Corp.*, 600 F.3d 954, 960 (8th Cir. 2010). However, it is also well established that "hostile work environment" and "constructive discharge" are "wholly distinct causes of action under Title VII." *Winspear v. Cmty. Dev., Inc.*, 574 F.3d 604, 607 (8th Cir. 2009). And, importantly, in this case, Benner's constructive discharge claim is not founded "on the same allegations" as his hostile work environment claim. *O'Brien*, 532 F.3d at 811. That is, in his (dismissed) claim of hostile work environment, Benner focused solely on the fact that he felt "insulted" by all the "frivolous" investigations initiated against him. *Benner*, 2017 WL 6001736, at *8-9. By contrast, Benner's constructive discharge claim asserts that, not only did he feel compelled to leave SPPS because of the "harassing" nature of the investigations against him, but that he felt compelled to leave because he thought he faced a real risk of termination in the coming school year (and accordant "scarlet letter"). (*See supra* at 36-37.) Thus, because the factual record supports a reasonable jury finding for Benner on his constructive discharge theory (as distinct from his dismissed "hostile work environment" theory), Benner may present this theory to the jury, prior ruling notwithstanding.

**Fourth**, Defendants argue that, because Benner testified that he "went back and forth" about staying at SPPS, versus moving to Community of Peace, during the summer of 2015 (*see* Benner Dep. at 111, 152-53), the Court should find that "no reasonable juror could conclude that Benner himself – to say nothing of an objectively reasonable person – felt

53

compelled to resign by anything other than the pull of an ultimately more attractive job offer." (Defs.' Br. at 25.) However, this argument ignores Benner's actual testimony. As the Court described above, Benner "seriously considered" staying in SPPS, "but, after learning that his 'investigations [were] going to follow [him]'" to his new school, such that he would still be at risk of losing his job were another investigation initiated, Benner decided that he had '*no choice*' but to leave SPPS for good. (*Supra* at 37 (quoting Benner Dep. at 110).) Indeed, Benner's stated reason for resigning is consistent with his August 4, 2015 resignation notice, as well as the recollection of at least one of his colleagues. (*See id*.) And, to the extent Defendants argue that Benner's stated reasons for resignation lack credibility, that is an argument best placed before the jury, not this Court. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

*Fifth*, Defendants argue that, because six months elapsed between the February 2015 written reprimand and Benner's decision to resign from SPPS in August 2015, no reasonable juror could find that Benner has "demonstrate[d] a causal connection between the investigations/write-ups and his resignation." (Defs.' Br. at 26.) The Court disagrees with this argument, too. Evidence in the record, including Benner's testimony, shows that Defendants' alleged mistreatment of Benner did not conclude with the February 2015 written reprimand, and that, when Benner resigned, he did so because he genuinely believed he faced a substantial risk of termination were he to remain in the District. (*See supra* at 34-38.) Moreover, the "months-long" delay in Benner's resignation occurred largely because SPPS,

like most school districts in America, provides its employees with a "months-long" summer vacation. This context matters. *Cf. Burlington*, 548 U.S. at 69 ("Context matters."). Thus, although Benner's indecisiveness over the course of the summer may ultimately prove fatal to his claim of constructive discharge, this is a far cry from the cases cited by Defendants, where a plaintiff argued "constructive discharge" based solely on conduct that happened to them several months prior to their resignation. *See, e.g.*, *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1185 (9th Cir. 2005) (finding that plaintiff's claim of "constructive discharge" due to "intolerable sexual harassment" was weakened by fact that "the last time [supervisor] made inappropriate sexual advances or comments to [plaintiff]" was "five months" before plaintiff resigned).

*Sixth*, and finally, Defendants assert that, because SPPS's current head of HR, Jim Vollmer, attested by declaration that tenured teachers are entitled to a significant amount of process before termination, and because SPPS never initiated any of this process against Benner, Benner's "fear of termination" was "speculative and unfounded," and "does not create a jury issue on constructive discharge." (Defs.' Br. at 28.) Again, though, there is no dispute that the written reprimands contained language that would allow SPPS to terminate Benner "for cause." (*See supra* at 20 and n.19.) Indeed, the reprimands themselves contained statements like, "if there are further problems, more serious disciplinary action may be taken, up to and including discharge." (*Id.* at 33.) More still, Benner testified that his fear of termination was not based on speculation, but, rather, on conversations with his union representative. (*Id.* at 36.) Accordingly, it is for the jury, not this Court, to decide if Vollmer's (ex-post) testimony about the likelihood of Benner's termination is entitled to more weight

than Benner's (real time) fear that he faced a substantial risk of termination were he to remain in the District.

For these reasons, the Court denies Defendants' summary judgment motion as to "adverse employment action."

## B. Title VII Race Discrimination

### 1. The Law

The Court now turns to Benner's first claim against SPPS: Title VII race discrimination. Title VII of the Civil Rights Act of 1964 makes it unlawful for certain employers "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). An employee may prove unlawful racial discrimination in one of two ways. First, "the employee may produce direct evidence of discrimination, which is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *EEOC v. Audrain Health Care, Inc.*, 756 F.3d 1083, 1086 (8th Cir. 2014) (cleaned up).

Second, and more commonly, the employee may "create[e] an inference of unlawful discrimination through the *McDonnell-Douglas* analysis." *Burton v. Ark. Sec. of State*, 737 F.3d 1219, 1229 (8th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To do this, the employee "must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action,

and (4) the circumstances give rise to an inference of discrimination." *Id*. This fourth element may be proven "in a variety of ways, such as by showing more favorable treatment of similarly-situated employees who are not in the protected class." *Id*. Once the employee makes this "prima facie" case, the employer may rebut the employee's evidence by providing "a non-discriminatory, legitimate justification for [their] conduct." *Id*. "Once the [employer] provides this reason, the presumption of discrimination disappears, requiring [the employee] to prove that the proffered justification [was] merely a pretext for discrimination." *Id*. (cleaned up).

## 2. Analysis

As the Court noted above, Defendants do not argue that they are entitled to summary judgment on this claim for any reason other than a lack of "adverse employment action." As the Court has rejected that argument, it need not spend significant time reviewing Benner's evidence with respect to this claim. *Cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion."). Instead, the Court will simply note that, as was true at the motion to dismiss stage, Benner has adequately set forth a "prima facie" case of racial discrimination, particularly with respect to identifying "similarly situated" white teachers who were treated more favorably than him. (*See, e.g.*, *supra* at n.11, n.12, n.17; *accord Benner*, 2017 WL 6001736, at *6.) Whether Benner will ultimately succeed in proving this claim, however, remains a question for the jury.

For these reasons, and given the absence of any argument by SPPS to the contrary, the Court denies SPPS summary judgment as to Benner's Title VII race discrimination claim.

### C. Minnesota Whistleblower Act Retaliation

#### 1. The Law

The Court next turns to the first of Benner's three retaliation claims: Minnesota Whistleblower Act retaliation against SPPS. Minnesota law provides that "[a]n employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because . . . the employee . . . in good faith, reports a violation, suspected violation, or planned violation of any federal or state law . . . to an employer . . . ." Minn. Stat. § 181.932, subd. 1(1). A "report" can be a "verbal, written, or electronic communication." *Id.* § 131.931, subd. 6. To recover for "retaliation" under this Act, an employee "must prove that [their employer] took adverse employment action against them because [they] engaged in statutorily protected conduct, here, making a good faith report of a suspected violation of law." *Sellner v. MAT Holdings, Inc.*, 859 F.3d 610, 614 (8th Cir. 2017).

Importantly, an employee need not show that the conduct described in their report was "actually unlawful," "only that" they acted "in good faith" in reporting the violation (or suspected violation). *Id.* Further, "good faith" does *not* mean that the employee "acted with the purpose of exposing illegality." *See Friedlander v. Edwards Lifesciences, LLC*, 900 N.W.2d 162, 166 (Minn. 2017). Rather, "good faith" only means "that the report at issue" was not "knowingly false or made in reckless disregard of the truth of the matter asserted in the report." *Id.* at 165; *accord Scarborough v. Federated Mut. Ins. Co.*, No. 15-cv-1633 (DWF/KMM), 2019 WL 1430133, at *5-6 (D. Minn. Mar. 29, 2019) (applying *Friedlander* and concluding, at summary judgment, that plaintiff made a "good faith report" simply by

telling his supervisor that his colleague's "conduct was illegal," and by then "rais[ing] the possibility that [his colleague] could have violated tax laws").

As with a Title VII race discrimination claim, an employee may prove that they suffered "adverse employment action" *because of* their protected conduct through "direct evidence, or in its absence, [through] the *McDonnell Douglas* burden-shifting structure." *Sellner*, 859 F.3d at 614.

### 2. Analysis

Because SPPS has not argued that anything besides a lack of "adverse employment action" supports granting it summary judgment on this claim, and because the Court rejected that argument above, the Court will not spend significant time on this claim either. Rather, the Court will simply note that evidence in the record supports a reasonable jury finding that **(1)** Benner believed, in "good faith," that SPPS's "racial equity" policy was illegal,[21] **(2)**

---

[21] Although Benner did not articulate his concern in precise legal language, a fair reading of his testimony shows that he was relying on well-established law holding that, by and large, it is illegal for public schools to treat students differently based on the color of their skin. *See, e.g.*, *Parents Involved in Comty. Schools v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 747 (2007) (holding that school district could not rely solely on race in allocating students to various schools in the district, and noting that "the Fourteenth Amendment [to the U.S. Constitution] prevents states from according differential treatment to American children on the basis of their color or race"); *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001) (explaining that Title VI of the Civil Rights Act of 1964 bars recipients of federal funds, which could include school districts, from intentionally discriminating on the basis of race). Indeed, in his brief, Benner points out that at least one federal circuit court has specifically stated that "racial disciplinary quotas" are both illegal and inequitable. *See People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 528 (7th Cir. 1997) (Posner, J.,) ("Racial disciplinary quotas violate equity in its root sense. They entail either systematically overpunishing the innocent or systematically underpunishing the guilty. They place race at war with justice. They teach schoolchildren an unedifying lesson of racial entitlements. And they

Benner reported this concern (in so many words) at both the May 20, 2014 school board meeting, and in subsequent conversations with SPPS's then-Superintendent Silva, and **(3)** SPPS took adverse employment actions against Benner throughout the 2014-2015 school year because he reported this concern. Therefore, Benner may properly present his Minnesota Whistleblower Act retaliation claim to a jury for trial.

For these reasons, and given the absence of any argument by SPPS to the contrary, the Court denies SPPS summary judgment as to Benner's Minnesota Whistleblower Act retaliation claim, too.

### D. Title VII Retaliation

#### 1. The Law

The second of Benner's three retaliation claims centers around Title VII of the Civil Rights Act of 1964. In addition to prohibiting outright racial discrimination in employment decisions, Title VII also prohibits "discriminat[ion] against" an employee who "has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation, an employee must show (1) that they "engaged in protected conduct by opposing a practice that a reasonable person could have believed violated [Title VII]," (2) "that a materially adverse action was taken against [them]," and (3) "that there was a causal connection between the protected conduct and the adverse action." *Helton*, 600 F.3d at 960.

---

incidentally are inconsistent with another provision of the [at-issue desegregation] decree, which requires that discipline be administered without regard to race or ethnicity.").

Title VII retaliation materially differs from Minnesota Whistleblower Act retaliation, in that the employee must oppose an "employment practice" that is illegal under Title VII itself, rather than just illegal as a general matter. *Compare* Minn. Stat. § 181.932, subd. 1(1) (barring retaliation against an employee who reports "in good faith," "a violation, suspected violation, or planned violation of *any* federal or state law") *with* 42 U.S.C. § 2000e–3(a) (barring retaliation against an employee who "oppose[s] any practice *made an unlawful employment practice by this subchapter*") (emphases added). Thus, for instance, an employer may not retaliate against an employee who files a charge of racial discrimination with the EEOC, *see, e.g.*, *Kim*, 123 F.3d at 1052, or who reports race-based harassment to upper management, *see, e.g.*, *Ellis*, 742 F.3d at 322. Similarly, an employer may not retaliate against an employee who "refuse[s] to implement a discriminatory [employment] policy," such as a human resources manager who refuses to execute a "racially motivated" firing. *EEOC v. HBE Corp.*, 135 F.3d 543, 554 (8th Cir. 1998).

By contrast, "opposing an employer's actions outside the ambit of an employment practice is unprotected by Title VII." *Artis v. Francis Howell North Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1183 (8th Cir. 1998). For example, in *Artis*, an assistant band director at a school claimed that he engaged in protected Title VII conduct by complaining to various school officials "about treatment that [the band director] gave a black student that [the plaintiff] perceived as disparate to that given to a white student." *Id.* The Eighth Circuit, however, held that, because discrimination against *students* was not illegal *under Title VII*, the plaintiff's complaint was not protected conduct for purposes of a Title VII retaliation claim. *Id.* Similarly, in a case where a school choir director claimed that he engaged in

protected Title VII conduct by criticizing his principal for "disregarding the needs of the [African-American] student body," the Eighth Circuit found that, because the plaintiff's opposition "related to concerns about the school's responsibility to the student body and not to employment practices," the plaintiff's conduct also failed to meet the first element of a Title VII retaliation claim. *See Evans v. Kansas City, Mo. Sch. Dist.*, 65 F.3d 98, 101 (8th Cir. 1995). Other Eighth Circuit cases illustrate this same point. *See, e.g.*, *Bonn v. City of Omaha*, 623 F.3d 587, 592 (8th Cir. 2010) (holding that police auditor's release of an internal report accusing the department of discriminatory policing tactics could not be construed as opposition to "employment practices that violated Title VII, simply because the [discriminatory] tactics might affect the applicant pool for future employment opportunities"); *Bakhtiari v. Lutz*, 507 F.3d 1132, 1137 (8th Cir. 2007) (holding that student's complaint about university's allegedly discriminatory practices against foreigners did not constitute opposition to "employment practices" because "[a]ll of these [practices] pertain[ed] to [plaintiff's] status as a student, however, and not as a TA employed by [the university]").

## 2. Analysis

As is perhaps evident from the preceding section, Benner's Title VII retaliation claim here must fail because Benner did not oppose SPPS's "racial equity" policy on grounds that it was an illegal *employment practice* under Title VII. Rather, Benner opposed the policy because it treated African-American *students* differently than students of other races. (*See supra* at 12-13, 15.) As Defendants succinctly point out in their brief: "The alleged impact of the District's student discipline policies did not discriminate against any employee based on [the employee's] race. It impacted all teachers, regardless of their race. Accordingly, in

62

challenging SPPS's student discipline, Benner did not challenge a Title VII 'unlawful employment practice' and cannot invoke its retaliation provision." (Defs.' Reply Br. at 9.)

Benner's only argument to the contrary is to suggest that, because Benner (and other teachers) testified that "the District's implementation of racial equity made it difficult – if not impossible – to do their jobs," a reasonable jury could construe Benner's public advocacy as relating to an "employment practice" covered by Title VII. (*See* Pl.'s Opp. Br. at 56-57.) This argument misses the mark. As the Eighth Circuit has made clear, the employee must oppose the at-issue "employment practice" because they reasonably believe it violates Title VII, not simply because the policy makes their job "difficult," or is otherwise "unsavory." *See Bakhtiari*, 507 F.3d at 1137 (noting that making "legitimate complaints about unsavory actions by [an employer] . . . does not transform [those] complaints into complaints about unlawful employment practices"); *accord Evans*, 65 F.3d at 101 ("Title VII is not a 'bad acts' statute."). As Benner acknowledges in other sections of his brief (and as the Court explained in the Minnesota Whistleblower Act retaliation section of this opinion), the reason Benner thought "racial equity" was illegal was because it arguably violated either the Fourteenth Amendment of the U.S. Constitution or Title VI of the Civil Rights Act, *not* because it constituted a "discriminatory employment practice" under Title VII. (*See* Pl.'s Opp. Br. at 13-14; *accord supra* at n.21.) As such, there is no evidence from which a reasonable juror could conclude that, in either his May 20, 2014 speech to the school board, or in his subsequent conversations with Silva, Benner "engaged in protected conduct by opposing a practice that a reasonable person could have believed violated [Title VII]." *Helton*, 600 F.3d at 960.

For these reasons, the Court grants SPPS summary judgment with respect to Benner's Title VII retaliation claim.[22]

## E. First Amendment Retaliation

### 1. The Law

Benner's final retaliation claim – First Amendment retaliation – arises under 42 U.S.C. § 1983. This provision of federal law, commonly called "Section 1983," allows victims of allegedly unconstitutional state or local government actions to sue the offending government official(s) for money damages. It is well established that Section 1983 allows public employees to sue their employer, *i.e.*, the government, for retaliating against them merely for exercising their First Amendment rights. *See, e.g.*, *Shockency*, 493 F.3d at 948. This rule applies to public school teachers as much as any other government profession. *See, e.g.*, *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 572 (1968) ("Teachers are . . . the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal."); *accord Lane v. Franks*, 573 U.S. 228, 240 (2014) (favorably citing this quotation). "To establish employer retaliation in violation of the First Amendment," then,

---

[22] The Court acknowledges that it reached a different conclusion at the motion to dismiss stage. *See Benner*, 2017 WL 6001736, at *7. However, the Court based that decision solely off Benner's complaint, in which Benner *alleged* that he opposed "racial equity" because it was an illegal employment practice under Title VII. *Id.* With the benefit of a full record, however, the Court can now safely conclude that Benner did not oppose "racial equity" because he believed it violated Title VII but, rather, because he believed it violated other provisions of federal law. (*See, e.g.*, Pl.'s Opp. Br. at 13-14.)

"a public employee must prove: (1) he engaged in activity protected by the First Amendment; (2) the defendants took an adverse employment action against him; and (3) the protected conduct was a substantial or motivating factor in the defendants' decision to take the adverse employment action." *Lyons v. Vaught*, 875 F.3d 1168, 1172 (8th Cir. 2017) (cleaned up). A public employee's speech is protected by the First Amendment if they "spoke as a citizen on a matter of public concern," rather than "pursuant to [their] official duties." *Groenewald v. Kelley*, 888 F.3d 365, 371 (8th Cir. 2018); *accord Garcetti v. Ceballos*, 547 U.S. 410 (2006).

However, two important limitations exist with respect to Section 1983 claims that do not exist with respect to the other claims discussed in this opinion. ***First***, a municipality, such as a school district, is only liable for violating a plaintiff's constitutional rights if the violation arose pursuant to an "unconstitutional official custom or policy," *Hess v. Ables*, 714 F.3d 1048, 1054 (8th Cir. 2013), or where the decisionmaker who took the allegedly illegal action "possess[ed] final authority to establish municipal policy with respect to the action ordered," *Soltesz v. Rushmore Plaza Civic Center*, 847 F.3d 941, 946 (8th Cir. 2017) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). Courts generally look to "state and local law," or "state and local custom or usage having the force of law," to "identify the final policymaker." *Id*. Further, although an entity with final policymaking authority may also incur municipal liability if they "ratify" a subordinate's (allegedly unconstitutional) action, "ratification requires both knowledge of the alleged constitutional violation, and proof that the [final] policymaker specifically approved of the subordinate's act." *Id*. at 947 (citing *Lytle v. Carl*, 382 F.3d 978, 988 n.2 (9th Cir. 2004)). Similarly, although a "final policymaker" can be held liable if they "delegat[e] policymaking authority to a subordinate," such delegation

only occurs if the "[subordinate] official acts (1) free of review and (2) without any constraints imposed as a matter of policy by the original policymaker." *Id*.

These limitations all stem from the seminal 1978 Supreme Court decision *Monell v. Dep't of Soc. Servs.*, in which the Court held that "it is when execution of a government's policy[,] . . . by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. 658, 694 (1978). In other words, "[a] municipality bears responsibility for *its own* torts, *not* the torts of its employees." *Soltesz*, 847 F.3d at 947 (emphasis added).

**Second**, an individual actor, such as a school principal, is only personally liable for violating a plaintiff's constitutional rights if they violated a "clearly established constitutional right of which a reasonable person would have known." *Lyons*, 875 F.3d at 1171 (cleaned up). Importantly, as the Eighth Circuit recently emphasized in an *en banc* First Amendment retaliation decision, it is a "longstanding principle" that "clearly established law should not be defined at a high level of generality," and should instead be "particularized to the facts of the case." *Morgan v. Robinson*, 920 F.3d 521, 523-24 (8th Cir. 2019) (*en banc*) (cleaned up) (finding individual defendant not liable for violating plaintiff's First Amendment rights due to lack of "particularized" law establishing those rights). The plaintiff bears the burden of "demonstrat[ing] that the law is clearly established," and, although the plaintiff need not identify a case "directly on point," they must show that "existing precedent placed the . . . constitutional question beyond debate" as of the time the government official acted. *Id*. (cleaned up). This principle is called "qualified immunity," and it exists to "give government

officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lyons*, 875 F.3d at 1171 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

## 2. Analysis

Because neither Defendant argues against the merits of Benner's First Amendment claim (other than to repeat the "adverse employment action" contentions rejected above), the Court will assume for purposes of this motion that a reasonable juror could rule in Benner's favor on the merits of his retaliation claim. Instead, the Court will consider, in turn, the *Monell* liability and qualified immunity arguments that Defendants set forth in their briefs.

### a. *SPPS's* Monell *Defense*

Defendants first argue that SPPS cannot be held liable as a municipal actor because the SPPS *school board* is the "final policymaker" for purposes of *Monell* liability. (*See* Defs.' Br. at 32 (citing Minnesota state law in support of this contention).) And because Benner fails to point to any adverse employment action taken by the school board against him, Defendants continue, no reasonable jury could hold SPPS liable for retaliating against Benner for exercising his First Amendment rights. (*Id.*) In response, Benner solely contends that "the long trail of e-mails between Board President [Keith] Hardy, other District officials, and Superintendent Silva about Benner's opposition to racial equity implementation," show that a reasonable jury could find that the SPPS school board worked with SPPS administrators to retaliate against Benner. (Pl.'s Opp. Br. at 57-58.)

The Court agrees with Defendants. After carefully reviewing the evidence (allegedly) connecting the SPPS School Board to the adverse employment actions taken against Benner, the Court finds that a reasonable juror could only conclude that Silva and Hardy internally

discussed Benner's advocacy, and that they often cast Benner in a negative light while doing so. (*See, e.g.*, *supra* at 16-17 (describing e-mail exchanges between Silva and Hardy during the summer of 2014).) No reasonable juror could infer from this evidence, however, that the *entire* school board "ratified" the administrators' conduct, in that they "knew" of the adverse employment actions Silva, Collins, Gruenewald, and various HR officials were taking against Benner, and then "specifically approved" those actions. *Soltesz*, 847 F.3d at 947. And because Benner does not argue that the school board "delegated" the relevant "policymaking" authority to any subordinate official, or otherwise directly took any actions against him pursuant to school board "custom or policy," SPPS, as a municipal entity, cannot be held liable under Section 1983. *Id.*

For these reasons, the Court grants Defendant SPPS summary judgment with respect to Benner's First Amendment retaliation claim against it.

### b. *Gruenewald's Qualified Immunity Defense*

With respect to Principal Gruenewald – the "individual defendant" – Defendants argue that, because there is no "clearly established legal right to be free from investigations and write-ups" in response to First Amendment-protected speech, Gruenewald cannot be held personally liable under Section 1983. (Defs.' Br. at 33.) Benner ripostes by arguing that Defendants' argument is a "straw man," and that what "Benner actually claims . . . is that he has the right to be free from constructive discharge in retaliation for exercising his First Amendment rights." (Pl.'s Opp. Br. at 58 (citing *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138, 140 (1983); and *Lane v. Franks*, 573 U.S. 228, 240 (2014)).)

The Court again agrees with Defendants. As the Court sees it, the "particularized" First Amendment right at issue here is the right for a public employee to be free from a series of unsupported adverse employment actions, including reprimands threatening termination, that cumulatively cause the employee to feel as if they have no choice but to resign, and all of which occurred because the employee spoke on a matter of public concern. However, Benner has failed to point to any Eighth Circuit case law, or even "robust consensus of cases of persuasive authority," *Lyons*, 875 F.3d at 1172, where a court held an individual defendant liable for First Amendment retaliation under this "particularized" First Amendment right. *See Morgan*, 920 F.3d at 524 ("[A plaintiff] has the burden to demonstrate that the law is clearly established."); *cf. Lyons*, 875 F.3d at 1176 (granting defendant summary judgment on qualified immunity grounds, and noting that plaintiff "failed to show, using the particularized inquiry required, that his right to make *this* speech *in these circumstances* was clearly established"). The Supreme Court cases Benner cites did not involve the kind of adverse employment action(s) at issue here,[23] and the factually analogous cases the Court cited above did not contain a claim of First Amendment retaliation, *see, e.g.*, *Ellis*, 742 F.3d at 323-24; *Sanders*, 669 F.3d at 893; *Phillips*, 256 F.3d at 849; *Kim*, 123 F.3d at 1060-61. Therefore, because Benner has not met his burden of specifying the "particularized" law that could have

---

[23]     In *Pickering*, the Supreme Court found that a school board violated the First Amendment when it approved the discharge of a teacher simply because the teacher wrote a critical letter to the editor. In *Connick*, the Supreme Court found that a district attorney did *not* violate the First Amendment when he terminated one of his subordinates for circulating an internal questionnaire that was arguably critical of his decision-making. And in *Lane*, the Supreme Court found that a community college violated the First Amendment when it terminated an employee for testifying, in open court, against a state representative who had previously worked with the college.

put Gruenewald on fair notice that her actions potentially violated Benner's First Amendment rights, Gruenewald is entitled to qualified immunity. *Compare with Kong v. City of Burnsville*, No. 16-cv-3634 (SRN/HB), 2018 WL 6591229, at *17 (D. Minn. Dec. 14, 2018) (denying qualified immunity at summary judgment where plaintiff pointed to a "squarely governing" Eighth Circuit precedent with roughly analogous facts to the case at issue).

For these reasons, the Court grants Defendant Gruenewald summary judgment with respect to Benner's First Amendment retaliation claim against her.

### F. Punitive Damages

Finally, the Court considers whether it must strike Benner's request for punitive damages for failure to comply with Minnesota law. Specifically, Defendants argue that Benner violated Minn. Stat. § 549.191 by including a request for punitive damages in his complaint(s), but without following the process mandated by that statute:

> Upon commencement of a civil action, the complaint must not seek punitive damages. After filing the suit a party may make a motion to amend the pleadings to claim punitive damages. The motion must allege the applicable legal basis . . . for awarding punitive damages in the action and must be accompanied by one or more affidavits showing the factual basis for the claim. At the hearing on the motion, if the court finds prima facie evidence in support of the motion, the court shall grant the moving party permission to amend the pleadings to claim punitive damages.

This process "was enacted to prevent frivolous punitive damage claims by allowing a court to determine first if punitive damages are appropriate." *Gamma-10 Plastics, Inc. v. Am. President Lines, Ltd.*, 32 F.3d 1244, 1255 (8th Cir. 1994).

However, as Benner correctly notes, Section 549.191 is inapplicable to the present action because Benner's (surviving) claims are premised on federal question jurisdiction and

on supplemental jurisdiction, *not* on diversity jurisdiction. *See, e.g.*, *Target Corp. v. LCH Pavement Consultants, LLC*, 960 F. Supp. 2d 999, 1010 (D. Minn. 2013) ("In *diversity actions such as this*, the pleading of punitive damage claims must generally conform to the requirements of Minn. Stat. § 549.191."); *Healey v. I-Flow, LLC*, 853 F. Supp. 2d 868, 873 (D. Minn. 2012) ("Our federal court utilizes section 549.191's gatekeeping procedure in *diversity cases* because it discourages forum shopping between state and federal court."). Indeed, after Benner raised this point in his opposition brief, Defendants declined to offer a response in either their reply brief or at oral argument.

For these reasons, the Court denies Defendants' motion to strike Benner's request for punitive damages.[24]

## III.   ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 73] is **GRANTED IN PART AND DENIED IN PART**.

---

[24]      To the extent Defendants are arguing that Minn. Stat. § 549.191 applies to Benner's Minnesota Whistleblower Act retaliation claim, but not to his Title VII race discrimination claim, the Court finds such argument futile. Even if Benner were to file a motion requesting permission to seek punitive damages under the Minnesota Whistleblower Act, the Court would grant the motion because the record provides "prima facie" evidence that SPPS potentially acted with "deliberate disregard" for Benner's rights. *See* Minn. Stat. § 419.20; *accord Ramirez v. AMPS Staffing, Inc.*, No. 17-cv-5107 (DWF/BRT), 2018 WL 1990031, at *9 (D. Minn. Apr. 27, 2018) (allowing plaintiff to amend their complaint to seek punitive damages under the Minnesota Whistleblower Act, and explaining that "prima facie evidence means that the court only looks at the evidence of the moving party, and does not make any credibility rulings or even consider the other parties' evidence").

This matter is set for trial on the Court's August 19, 2019 trial calendar. A separate pretrial order will be issued forthwith.

Dated: May 3, 2019                              s/Susan Richard Nelson
                                                SUSAN RICHARD NELSON
                                                United States District Judge